# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

| | | |
|---|---|---|
| WILLIAM ORR, | ) | **FILED** |
| | ) | ASHEVILLE, N.C. |
| Plaintiff | ) | |
| | ) | JUN 0 7 2021 |
| vs. | ) | |
| | ) | U.S. DISTRICT COURT |
| U.S. EPA | ) | W. DIST. OF N.C. |
| U.S. DEPARTMENT OF INTERIOR | ) | PLAINTIFF'S |
| FRENCH BROAD ELECTRIC MEMBERSHIP | ) | VERIFIED |
| CORPORATION | ) | COMPLAINT |
| U.S. FOREST SERVICE | ) | |
| JEFF LOVEN | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| | ) | |
| Defendants | ) | |


## PLAINTIFF'S TEMPORARY/PRELIMINARY INJUNCTION COMPLAINT

### INTRODUCTION

Plaintiff's instant claims while related to those in *Orr v EPA*, civil action case No.

1:19-cv-00226-MOC-WCM ("*226*") are highly distinguishable, either because they were

not addressed by the Court's 5/15/20 dismissal Order (Doc 53), or because they do not

challenge the validity of an Agency order, nor request cancellation or suspension of a

registration under FIFRA, unlike those of *226*.[1] They further are fashioned exclusively as

ESA claims, not APA nor FIFRA[2] claims, and thus distinguishable from the dismissed

---

[1] In other words, they're distinguishable from the claims asserted in *Center for Biological Diversity v. EPA*, 106 F. Supp. 3d 95, 99-100 (D.D.C. 2015), cited in the District Court's Dismissal Order (Doc 53, p 19-20), because instant Plaintiff claims do not seek an order "canceling or otherwise modifying a FIFRA registration," (See *Cause of Action* below).
[2] *Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir, 2005) at 1034 ("Because this substantive statute [ESA] independently authorizes a private right of action, the APA does not govern the plaintiffs' claims. Plaintiffs' suits to compel agencies to comply with

claims of *226, Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir, 2005) at 1033 ("EPA's regulatory discretion is not limited by FIFRA in any way that would bar an injunction to enforce the ESA."), *Id.*, at 1031 ("It is well-settled that a court can enjoin agency action pending completion of section 7(a)(2) requirements."). See *Cause of Action* below why instant claims do not implicate FIFRA.

Plaintiff appealed *226* on July 13, 2020 (Doc 56), which was docketed by the 4th Circuit after a 7 month delay in the District Court's transmission of the record (2/25/21, Doc 58). Plaintiff just recently filed his Opening Appellate Brief 5/24/21.

Plaintiff separately filed this date a Stay of the District Court's *226* Dismissal Order (Doc 53) pending exhaustion of Appellate proceedings.

This urgent Injunction request arises out of Defendants FBEMC and Jeff Loven's foreknown advance knowledge of the hazards of their herbicide right-a-way ("ROW") clearing program on and around Roan Mountain to threatened/endangered species, their habitats, including critical habitat, yet knowing this they intend, are or will imminently re-spray Roan Mountain,[3] thus mandating immediate injunctive relief.

In the interest of Justice, preventing grave irreparable injury, preserving the status quo (e.g. protecting ESA listed species from extinction) and for reasons below, Plaintiff's respectfully requests immediate consideration of this matter by the District Court Western District of North Carolina, Asheville Division.

**PRAYER**

---

the substantive provisions of the ESA arise under the ESA citizen suit provision, and not the APA.")
[3] See Attachment 1, 5/26/21 FBEMC's Notice showing May/June 2021 ROW Herbicide Schedule of Roan, which includes Buladean, Red Hill, Fork Mountain.

1. Plaintiff prays for a Temporary and Preliminary Injunction enjoining EPA's to comply with § 1536 (d)[4] with regards to its interim-registration of glyphosate until EPA has concluded all requisite § 1536 (a)(2) Consultation with U.S. Fish and Wildlife Service.

2. Plaintiff prays for a Temporary and Preliminary Injunction enjoining EPA to commence its requisite § 1536 (a)(2) Consultation with U.S. Fish and Wildlife Service,[5] in the event EPA hasn't already done so.[6]

3. Until EPA concludes requisite §1536 (a)(2) glyphosate consultation with U.S. Fish and Wildlife Service ("USFWLS"), Plaintiff prays for a Temporary and Preliminary Injunction under § 1536 (d), enjoining Defendants French Board Electric Membership Corporation ("FBEMC") and Jeff Loven, personally, and as General Manager of FBEMC,[7] from spraying EPA registered Rodeo (Glyphosate), Polaris (Imazapyr) or any Glyphosate herbicide as part of FBEMC's vegetative/tree clearing program of its Right-Of-Way ("ROW") easements on or near Roan Mountain, N.C.

4. Alternatively, Plaintiff prays for a Temporary and Preliminary Injunction enjoining FBEMC's[8] spraying of glyphosate only registered herbicides on or nearby Roan

---

[4] *Id.*

[5] *Id.*

[6] It is Plaintiff's understanding that EPA's 11/20/20 Biological Evaluation under § 1536(c) represents the first step in § 1536(a)(2) consultation.

[7] FBEMC and Loven are employing the subject glyphosate registration and thus constructive recipients/actors/licensees contemplated in § 1536 (d) prohibition of "the Federal agency and the permit or license applicant... not mak[ing] any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a) (2) of this section."

[8] *Id.*

Mountain pursuant to § 1536 (d),[9] until EPA has concluded its requisite § 1536 (a)(2)

Consultation with U.S. Fish and Wildlife Service.

5.   Plaintiff prays for a Temporary and Preliminary Injunction enjoining Defendants

French Board Electric Membership Corporation ("FBEMC") and Jeff Loven, personally,

and as General Manager of FBEMC, from spraying/re-spraying EPA registered Rodeo

(Glyphosate), Polaris (Imazapyr) or any Glyphosate containing herbicide as part of

FBEMC's vegetative/tree clearing program of its Right-Of-Way (ROW) easements on or

near Roan Mountain either side of N.C. or T.N., where said spraying irreparably

harms/kills/takes ESA listed species, significantly and adversely harms/modifies their

habitats, including critical habitat, risks their extinction and any activity otherwise

constituting an illegal § 9 "Take" under the Endangered Species Act (ESA)

(Endangered Species Act of 1973, 87 Stat. 884, 16 U.S.C. 1531- 1543).[10] [11]

6.   Plaintiff prays for a Temporary and Preliminary Injunction enjoining EPA from

illegally "Taking" listed species on Roan Mountain under § 9.[12]

---

[9] *Id.*

[10] § 1540 (g) Citizen suits
"(1) Except as provided in paragraph (2) of this subsection any person may commence a
civil suit on his own behalf -
(A) to enjoin **any** person, including the United States and any other governmental
instrumentality or agency (to the extent permitted by the eleventh amendment to the
Constitution), who is alleged to be in violation of any provision of this chapter or
regulation issued under the authority thereof (emphasis added)."
[11] The District Court's 5/15/20 dismissal Order (Doc 53) appears to be silent on a § 9
claim against FBEMC.
[12] See *Allegations* # 21 ("Defendant EPA after receipt of said Plaintiff's 5/26/17, 4/30/18,
7/5/19, 3/12/21 Notices (either individually or collectively) admits or knew its registered
glyphosate herbicides as used by FBEMC on or near Roan Mountain results in an illegal
§ 9 take of her listed species, by either significant adverse habitat modification,
disappearance of listed species from their habitat, their death and/or extinction,
particularly now in view of EPA's 11/20/20 BE admission of such likely adverse affect of
listed species."). See *Cause of Action* for details.

7. Pro-se Plaintiff prays this Court for deference because of his ignorance of environmental law and to provide any other relief, equitable or legal, which may be available to prevent the irreparably harm/killing or take of ESA Protected Species and significant adverse modification of their habitats, including critical habitat on Roan Mountain.

## INCORPORATED BY REFERENCE

Plaintiff incorporates by reference the record of *Orr v EPA, et., al.*, Civil Action Case No. 1:19-cv-00226-MOC-WCM ("*226*") and herein recites that record as "Doc __, P __. " Plaintiff sets forth relevant incorporated prior Declarations in Attachment 5.

## JURISDICTION AND VENUE

An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a)(10) (Declaratory Judgments). U.S. District venue is proper pursuant to 28 U.S.C. § 1391(b), because Defendants reside, conduct business, have office, use federally registered pesticides and/or are subject to regulatory/judicial oversight within this district. Plaintiff additionally resides in this U.S. District.

Jurisdiction is claimed under 16 U.S.C. §§ 1531 et. seq., § 1540(g)(1)(a), § 1540(g)(3)(A), § 1536 (a)(2), § 1536 (d), Pub.L. 79–404, 60 Stat. 237, 28 U.S.C. § 1331, 28 U.S.C 1343, 28 U.S.C. § 1331, Federal Rule of Civil Procedure 65, *United States v. Olander,* 584 F.2d 876, 881 (9th Cir. 1978), and the court's general jurisdiction under Title 28, United States Code.

Plaintiff does not claim jurisdiction under FIFRA or APA,[13] rather only under

ESA.[14] [15]

**PARTIES**

(See Plaintiff's 7/19/19 Complaint, Doc 1, p 19-21)

**BACKGROUND**

Plaintiff incorporates by reference his *Parties/Background* from his 7/19/19

Complaint (Doc 1, p 13 - 21), *Background/Statement of Facts* (Doc 1, p 21 - 24) and his

12/4/19 Amended Complaint *Background* (Doc 29, p 14-18), as if set forth herein.

Additional background follows:

Plaintiff (age 69, a retired scientist, inventor, businessman) lives alone together

with nature far from other humans in an isolated wilderness location deep on Roan

Mountain ("Roan"), North Carolina, not far from its peak. Roan rests on the border of NC

and TN in the Pisgah National Forest

https://www.fs.usda.gov/recarea/nfsnc/recarea/?recid=48114.

She contains some of the purest, most ancient wild life habitats in the world (or at

least once did prior to FBEMC's initial 2017 spraying). One of America's most respected

scientists of the last century, Asa Gray (renown Harvard Professor, close

confidante/colleague of Charles Darwin, https://www.wired.com/2011/04/how-charles-

---

[13] FN 2, *supra*

[14] The ESA allows any person, including entities, to: commence a civil suit on his own behalf... to **enjoin** any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof, see 16 U.S.C. § 1540(g)(1).

[15] See *Cause of Action, FIFRA Does Not Override Plaintiff's District Court Injunctive Jurisdiction* below.

darwin-seduced-asa-gray/) regularly frequented Roan and claimed she had some of the rarest species in the world.

A multitude of incredible threatened and endangered ESA species (herein after "Protected or Listed Species") reside on the mountain **together** with Plaintiff sharing the very same habitat and resources.

Plaintiff is a naturalist, hiker, scientist, inventor, photographer, organic gardener and wild life/protected species conservationist (see cites below). Plaintiff is hyper sensitive to electromagnetic, chemical and other stressors, which is one of the reasons he lives in such a pristine/pure natural area (or at least once did) (Doc 1, p 18, 221-222)[16]

On or shortly after May 26, 2017 (Doc 1, p 60 - 92) and 4/30/18 (Doc 1, p 105 - 159) Plaintiff served upon Agency, Corporate and Individual Defendants 16 U.S.C. § 1531, §1540(g)(2)(A)(i) Notices of his intent to sue.

On June 1, 2017 Plaintiff filed *William Orr, et. al. v U.S. EPA, U.S. Forest Service, U.S. Fish And Wildlife Service, et. al.*, Civil Case No. 1:17-cv-00141-MR-DLH in the Western District Of North Carolina, which was quickly dismissed for Plaintiff's failure to provide 60 day advance notice under § 1540 (g)(2)(A)(i).

In the months of May and June 2017 French Broad Electric Membership Cooperative ("FBEMC") who supplies electricity to the mountain, changed its prior decades long practice employed since the beginning of electrical service on Roan, from

---

[16] Plaintiff notes this hypersensitivity is shared by higher genome listed species, (Doc 1, p 36, 36, 42, 128), which means his body is a good meter of their likely response to external stressors such as pesticides, electromagnetic radiation, et. al..

mechanical ROW vegetation management[17] to spraying a mixture of EPA registered *Rodeo* and *Polaris* herbicides on its easements.

On 7/19/19 relying on his 4/30/18 and 5/26/17 §1540(g)(2)(A)(i) Notices, Plaintiff filed *226 Orr v EPA, et. al.* Case 1:19-cv-00226-MOC-WCM in the Western District Of North Carolina. Plaintiff's TRO was dismissed as moot, because FBEMC claimed its spraying had ceased by the time of the 7/25/19 TRO hearing. His Complaint was later dismissed 5/15/20 as being jurisdictional barred and for lack of standing (Doc 53).

FBEMC re-sprayed again in the months of June/July 2019, allegedly completing it spraying prior to *226*'s 7/25/19 TRO Hearing. On each occasion in 2017 and 2019, Roan was exposed to monumental loads of herbicides given the vast total acreage implicated by FBEMC's ROW easements, topology, ambient atmospheric conditions and lingering hydrous drift. This presented overwhelming toxic shock and load to Roan that she has never seen before. Coupled with continuing hydrous drift the tragic result was the taking of listed species and the horrific destruction of habitat, including critical habitat.

Plaintiff unsuccessfully sought on each occasion in 2017 and 2019 to enjoin this destruction. FBEMC's second spraying had a non-linear adverse affect on listed species compared to its first, due to accumulated threshold load (Doc 19, p 69 ¶ 46; Doc 22, 24, 289). A 3rd or any future spraying will result in an even more horrific catastrophic affect to listed species and their habitats.

---

[17] e.g. Cutting down intruding trees via saws and other mechinary.

Trees naturally grow in forests and FBEMC admits it must periodically re-spray its ROW easements in perpetuity with its new herbicide vegetative management program as new vegetative grows (Doc 17, p 12; Doc 1, p 57, 94, 104, Doc 1. p 305 ¶ 89).

Plaintiff filed his original (first) *226* Complaint 7/19/19 (Doc 1) and his amended *226* Complaint 12/4/19 (Doc 29), which both alleged § 9 Take (Doc 1, p 1-2, 5; Doc 29, p 1-5, 10, 23), including within critical habitat (Doc 1, p 2, 5, 28; Doc 29 p 2, 4-5, 10) and EPA's failure to consult under ESA § 7 with USFWLS (16 U.S.C. § 1536), (Doc 1, p 8; Doc 29, p 10, Doc 53, p 4). These allegations are incorporated herein.

On 7/25/19, during a *226* TRO hearing, Plaintiff presented technical/scientific evidence via a Power Point Presentation (Attachment 4, hereto), which likewise is incorporated here.[18] [19] (Plaintiff proposes to refile this electronically after electronic ECF filing permission might be granted, because it contains vital distinguishing color photos and other evidence of significant adverse habitat modification and take).

---

[18] Plaintiff's Power Point Presentation 7/25/19 presented visual, photographic, video and orally evidence for approximately an hour (Attachment 3, hereto). During that time he showed his intimate relationship/connection with ESA species on Roan; his isolated wilderness location; his cohabitation with said species, photos of species, studies he's conducting; how hydrous drift occurs; compelling graphic "one to one" (cause and effect) evidence disclosing "how" and "why" the monumental load from FBEMC's mountain wide spraying killed/severely harmed protected species and their habitats; how this adversely affected/killed the Bombus affinis' and other species, including insects, which were plentiful at Plaintiff's residence prior to FBEMC's 2017 spraying; presented graphic and video evidence of radical adverse habitat modification changes after spraying (foliage deformation, soil/air/water contamination, highly toxic soil formaldehyde emissions and the like); video evidence of contaminated rain from hydrous drift; detailed and showed how is injury was personal, its direct nexus to FBEMC's spraying (in short the requisite elements of standing).

[19] Attachment 4 is a true and exact copy of the graphic version of the 7/25/19 Power Point presented the Court, absent embedded videos and Plaintiff's oral testimony. Plaintiff recalls a court reporter transcribing his oral testimony, which transcript Plaintiff does not have and isn't sure is part of the record before the Appellate Court.

Plaintiff's *226* pleadings were made during a period where the parties (Doc 41, p 9) and the Court (Doc 53, 9) were well aware of EPA's pending re-registration efforts of glyphosate, the active ingredient of one of the problematic herbicides employed by FBEMC (Doc 1, p 3 -4). In Plaintiff's 2019 *226* Complaints he complained FBEMC's spraying would occur prior to EPA's completion of its glyphosate re-registration (Doc 1, p 20, 31)

During the height of the COVID scare[20] Plaintiff in *226* filed 3/13/20 Motion to Toll (Doc 46, p 2). It was during this period Courts were closed; Court access and communication restricted; when the media was reporting mass infections and casualties; when people were afraid, grossly uninformed/misinformed/worried about realities, nature of the virus's transmission, virility and risks (Doc 50, p2). Plaintiff at the time was scientifically deeply involved in virus research and health safety information disclosure long before it was generally on the public radar. He comprehended the apparent grave risks involved early on when few did (Doc 50, p 2-5). He was urgently trying to inform others of the risk (Doc 46, p 2-5); the need for proper safety measures before they were generally understood as being necessary; [21] he was sharing important scientific findings

---

[20] Doc 46, p 4 ("WHO reports a coronavirus mortality rate of **3.4%** globally, higher than previously thought,"), Id. p 5 ("Italy's fatality rate is running at more than **6%**..."Hou said the entire city of Wuhan is like 'hell on earth.' China's crematoriums are reportedly operating 24/7").

[21] Doc 46, p 24 ("While Plaintiff sincerely prays the USA impact of this virus does not reach Chinese, South Korean, Italian or Iranian levels, at this moment given the unchecked spread and want of testing, such an outcome is uncertain. Given the pressing urgency and magnitude of this crisis, Plaintiff strongly encourages the Court, its personnel and Defendants to take heed and immediately implement protective measures, including the daily taking of Zinc and Black Seed Oil, social distancing (no more hand shakes, hugs), wear facial and eye protection, regularly use alcohol based hand sanitization, handle incoming mail with caution, regularly sanitize/disinfect surfaces and

10

and safety information with many others, including important influencers, well before this information would later become publicly known or accepted. He was sharing information regarding real risks in an urgent effort to save lives (see generally Doc 46, 50), including lives and health of the Court.[22] He was researching possible herbal inoculates to prevent infection. He discovered one which he recommends to this day, Zinc and Black Seed Oil (Doc 46, p 3), which was subsequently published by another scientist, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7313527/

Simultaneously, he painstakingly worked to and did discover a potential cure for the virus using resonant frequency (Doc 50, p 6), which he later on 7/9/20 applied for U.S. patent protection on his invention entitled *Virus Eradication By Resonance Frequency Deactivation Of Genetic Material* (Attachment 20. Plaintiff simply could not conducted such an unexpected, urgent, monumental, brain numbing and overwhelming undertaking (more than an exhausting) regarding COVID during this extraordinary period of national emergency and simultaneously have prepared a responsive Reply/Amended Complaint, particularly while still also dealing himself with debilitating incoming toxic drifts (Doc 44, p 2; Doc 50, 7).

Thus, Plaintiff respectfully requested that his *226* case be tolled or dismissed absent prejudice (Doc 46; Doc 50, 7) so that when matters settled down Plaintiff could file a responsive Reply and Amendment.

On 5/15/20 absent Plaintiff's Reply or Amendment the District Court dismissed his *226*'s claims as being jurisdictionally barred with prejudice, absent comment

---

handled objects, anticipate near term mandatory quarantines, domestic travel restrictions...")
[22] *Id.*

(presumably on grounds of futility) (Doc 53).

On 7/13/20 Plaintiff appealed to the 4th Circuit Court of Appeals (Doc 56).

On 3/12/21 in response to and during the Comment period of EPA's *11/20/20 Draft National Level Listed Species Biological Evaluation (BE) for Glyphosate*, Plaintiff filed a Take Notice/Comment, entitled *Comment and Continuing § 9 Take Notice and Intention to Sue ESA §1540(g)* (Body 86 pages, Attachments A-E 169 pages, Total 255 pages), https://u.pcloud.link/publink/show?code=XZqMJBXZbVOnykBzscH9yHRohad3y0sfT9i y (cloud version), Attachment 3 (Plaintiff proposes to refile this electronically after electronic ECF filing permission might be granted, because it contains vital distinguishing color photos and other evidence of significant adverse habitat modification and take).

Said 3/12/21 Notice, which contained express citations § 9 Take (§ 1538) [23] and § 7 consultation (16 USC § 1536(a)(2)) [24] violations, incorporated Plaintiff's 5/26/17, 4/30/18 and 7/5/17 Notices as Attachments A-C thereto, which together was duly served 3/15/21 via registered mail return receipt requested upon the Secretaries of Interior, Commerce, Administrator of EPA, Director of USFWLS, Director of Asheville Office of USFWLS, FBEMC and Jeff Loven. It was further provided counsel via email.

As explained in said 3/12//21 Notice and allegations below each subsequent spraying by FBEMC introduces additional load to listed species and critical habitat where

---

[23] See for example Attachment 3 generally, p 1, 3, 7, 87

[24] See for example Attachment 3, p 12, 14- 16, 26, 27, 34-42, 25, at 26 ("ESA **requires** federal agencies consult with the expert wildlife agencies **before** taking any action that "**may affect**" any protected species or critical habitat. 50 C.F.R. § 402.14(a); see 16 U.S.C. [] § 1536(a)(2). *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020-21 (9th Cir. 2012) (en banc).")

the damage inflicted is non-linear, exhibiting a threshold effect (Attachment 3, p 3, 8, 20-21). For example, Plaintiff noted FBEMC's second spraying had a more adverse affect on listed species habitat compared to its first, due to accumulated load (Doc 19, p 69 ¶ 46; Doc 22, 24, 289). FBEMC's third spraying will likely have an even more catastrophic adverse affect. Listed species habitat needs critical time to heal and subsequent sprayings deny that opportunity, not only denying an opportunity for desperately needed recovery, but taking the already severely wounded fragile listed species and causing their extinction.[25]

Said 3/23/21 Notice asserts § 9 violation (§ 1538, Take, Attachment 3 , generally and p 1, 3, 87, 88) and § 7 violation (§ 1536, Consultation Attachment 3, generally and p 12, 14-17, 24, 26, 27, 34, 35, 37, 46, 85). Together with Plaintiff's prior attached Notices (5/26/17, 4/30/18 and 7/5/17) it discloses significant injury to listed species, significant adverse affect to their habitats and critical habitat as a consequence of FBEMC's ROW spraying herbicides containing glyphosate on Roan.

It further discloses specific affirmative discretionary agency acts taken by EPA, which triggered EPA's § 7 consultation duty, including but not limited to its preparing, making, conducting, publishing and taking public comments in its 9/8/15 *Registration Review - Preliminary Ecological Risk Assessment for Glyphosate and Its Salts* ("9/8/15

---

[25] Doc 28, p 26 ("This accumulative load to protected habitats is reaching a breaking point where said habitat will not be able to repair themselves to allow a return of protected species, which have abandoned them due to FBEMC earlier spraying... each spraying event (due to accumulated load) operates to further debilitate/adversely modify of an already severely injured protected specie habitat. In other words, adverse habitat modification becomes more radical with each spraying. The accumulative effect is not linear, because habitat[s] do not have sufficient time between spraying to sufficiently repair themselves. This in turn pushes the protected species on Roan Mountain closer to an extinction crisis.")

*Registration Review* ") (Attachment 3, p 16 FN 26, 151, 152, 154, 157, 158, 175), its May

6, 2019 *Glyphosate Proposed Interim Registration Review Decision,* Case Number 0178,

(Attachment 3, p 87- 144, p 5-6 FN 10, p 17 FN 27, p 87); its 1/22/20 *Interim*

*Registration Review Decision on Glyphosate* ("*Interim Registration Review Decision"*)

(Attachment 3, p 9, 12, 15, 16, 23, 35, 36, 38) and its *11/20/20 Draft National Level*

*Listed Species Biological Evaluation (BE) for Glyphosate* ("*Biological Evaluation* ")

(Attachment 3, p, 9, 11, 15, 41), also see discussion below.[26] Said 3/12/21 Notice further

discloses specific significant adverse Spruce fir moss spider critical habitat injury

imperiling the existence of said listed species, which separately mandates § 7 (a)(1).

On 5/18/21 in *NRDC v EPA* (9th Cir) Nos. 20-70787, 20-70801, a matter where

among other claims NRDC seeks to enjoin EPA for its failure to Consult pursuant to § 7

regarding EPA's 1/22/21 *Interim Registration*, EPA filed a *Motion For Partial Remand*

*Without Vacatur* suggesting its *Interim Registration* may be deficient regarding harm to

listed species and that EPA needs to revisit said *Interim Registration* (see *Motion*

generally, p 15), https://www.centerforfoodsafety.org/files/epa-mot-for-voluntary-partial-

remand_69756.pdf .

Necessitating this action, on 5/26/21 Plaintiff was sadly informed via FBEMC's

web site it would again be re-spraying Roan Mountain May/June 2021 (see Attachment 1

p 2, disclosing Red Hill, Buladean, Fork Mountain and other areas directly impacting

Roan Mountain). In a 5/28/21 personal telephone conversation with Jeff Loven, General

Manager of FBEMC, Loven informed Plaintiff spraying would commence mid June.

**STATUTORY/REGULATORY MATTERS**

---

[26] EPA's act taken in its 9/8/15 *Registration Review* was set forth among other EPA § 7
triggering acts in Plaintiff's 4/30/18 Notice (Doc 1, p 111 - 117).

Plaintiff incorporates by reference his *Statutory And Regulatory Matters* from his

12/4/19 Amended Complaint (Doc 28, p 25 - 28 regarding § 9 Take), as if set forth herein

below.

Plaintiff additionally sets forth the relevant provisions of 16 USC § 1536:

**(a) Federal agency actions and consultations**
(1) The Secretary shall review other programs administered by him and
utilize such programs in furtherance of the purposes of this chapter. All
other Federal agencies shall, in consultation with and with the assistance
of the Secretary, utilize their authorities in furtherance of the purposes of
this chapter by carrying out programs for the conservation of endangered
species and threatened species listed pursuant to section 1533 of this title.
(2) Each Federal agency shall, in consultation with and with the assistance
of the Secretary, insure that any action authorized, funded, or carried out
by such agency (hereinafter in this section referred to as an "agency
action") is not likely to jeopardize the continued existence of any
endangered species or threatened species or result in the destruction or
adverse modification of habitat of such species which is determined by the
Secretary, after consultation as appropriate with affected States, to be
critical, unless such agency has been granted an exemption for such action
by the Committee pursuant to subsection (h) of this section. In fulfilling
the requirements of this paragraph each agency shall use the best scientific
and commercial data available.

**(c) Biological assessment**(1) To facilitate compliance with the
requirements of subsection (a) (2) of this section, each Federal agency
shall, with respect to any agency action of such agency for which no
contract for construction has been entered into and for which no
construction has begun on November 10, 1978, request of the Secretary
information whether any species which is listed or proposed to be listed
may be present in the area of such proposed action. If the Secretary
advises, based on the best scientific and commercial data available, that
such species may be present, such agency shall conduct a biological
assessment for the purpose of identifying any endangered species or
threatened species which is likely to be affected by such action. Such
assessment shall be completed within 180 days after the date on which
initiated (or within such other period as is mutually agreed to by the
Secretary and such agency, except that if a permit or license applicant is
involved, the 180-day period may not be extended unless such agency
provides the applicant, before the close of such period, with a written
statement setting forth the estimated length of the proposed extension and
the reasons therefor) and, before any contract for construction is entered

15

into and before construction is begun with respect to such action. Such assessment maybe undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332).

**(d) Limitation on commitment of resources**
After initiation of consultation required under subsection (a) (2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respectto the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a) (2) of this section.

CAUSE OF ACTION

As presented herein, Plaintiff asserts jurisdiction is exclusively under ESA, not FIFRA or APA.

The ESA defines "take" as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct." [27] Current FWS regulations further define "harm" as "an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."

Case law has reviewed the meaning and scope of "harm" under the ESA. In *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon,* [28] the U.S. Supreme Court upheld the current regulatory definition of "harm," finding that habitat modification can constitute "harm" - and, therefore, a prohibited Section 9 "take" - if the habitat modification results in actual death or injury to wildlife; the court emphasized that

---

[27] 16 U.S.C. § 1532(19)
[28] *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon* (1995) 515 U.S. 687.

16

"every term in the regulation's definition of 'harm' is subservient to the phrase 'an act which actually kills or injures wildlife.'" The court found that FWS's definition was a reasonable interpretation of the ESA because "Congress intended 'take' to apply broadly to cover **indirect** as well as purposeful actions (emphasis added)." [29] Later cases such as *Defenders of Wildlife v. Bernal* [30] and *Arizona Cattle Grower's Ass'n v. U.S. Fish and Wildlife Service* [31] the 9th Circuit confirmed that, to qualify as "harm" under the ESA, habitat modification must result in actual death or injury to wildlife. The *Arizona Cattle Grower's* decision also held that, although "harm" could be prospective, the mere potential for harm is insufficient; rather, a take must be "reasonably certain to occur."

Under current USFWL regulations, habitat modification activities may qualify as "harm" only if all three of the following conditions are met:

1. The modification of habitat is significant;
2. The modification significantly impairs an essential behavior pattern of a listed species, including breeding, feeding or sheltering; and
3. The significant modification of habitat, with a significant impairment of an essential behavior pattern, is likely to result in the actual death or injury of wildlife.

Plaintiff respectfully submits his 5/26/17, 4/30/18, 7/5/17 and 3/12/21 Notices (Attachment 3), 7/25/20 TRO Hearing PPT (Attachment 4), Declarations (Attachment 5) and Allegations below (individually and/or collectively) establish the requisite elements above, namely the existence of concrete evidence showing "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." In

---

[29] Id., 515 U.S. 687, at 704
[30] *Defenders of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 1999).
[31] *Arizona Cattle Grower's Ass'n v. U.S. Fish and Wildlife Service*, 273 F.3d 1229 (9th Cir. 2001).

other words, FBEMC's spraying of Roan with EPA registered herbicides constitutes a

"take," because it results in the death and/or extinction of listed species. Plaintiff further

proffers his Rule 702 expert Dr. Richard McDonald, PhD., who at trial will testify to the

scientific evidence confirming each of the elements of Section 9 "take" and how

FBEMC's spraying meets each of these elements.

    As example, Plaintiff's 5/26/17, 4/30/18 and 7/5/19 Notices shows: glyphosate

impairs the gut microbiome of listed species, significantly adversely affecting their

critical natural immunity necessary for survival leading to death (Doc 1, p 45, 65, 130,

201 - 203); soil contamination of excessive formaldehyde due to Glyphosate

contamination, which directly kills soil based listed species like the affinis and/or

severely impairs their reproduction abilities leading to reproduction disability and

death.[32] Plaintiff's 3/12/21 Notice shows independent laboratory confirmation of

Glyphosate soil contamination, including within critical habitat (Attachment 3, p 51-53)

and concurrent significant adverse critical habitat affect (Attachment 3, p 67-78). The

presence of glyposate in soil also kills beneficial organisms essential to listed species[33]

---

[32] Doc 29, p 77; Doc 1, p 211-213 ("It should be noted native wild bees like Bombus
affinis do not reside in hives during the winter. The Queen affinis finds a hole in the
ground and hibernates there to emerge in the spring to birth her brood. Because the soil
on Roan and the affinis' natural habitat are now contaminated with GLY/AMPA/FA, the
affinis Queen will be weakened with likely impaired reproductively, that is assuming she
survives and emerges at all. It is noted formaldehyde is a known soil disinfectant and
anti-fungal agent. At a minimum given her exposure to GLY/AMPA/FA she will have
weakened gut microbiome with its negative implications. But, importantly because her
gut microbiome is already compromised she is prone to secondary pesticide toxicity from
a variety of different pesticides, for example from Sniper (Bifenthrin), which is a
commonly used pesticide by the many Christmas tree farmers on Roan Mountain, who
also concurrently spray glyphosate herbicides (footnotes omitted).")
[33] See Doc 1, p 62, 65, 66, 84, 94, 95, 110, 121 FN 50, 123, 139, 151 FN 105, 1151-154,
169, 181, 184- 193, 211-216

18

and additionally reacts to generate excessive toxic soil formaldehyde,[34] exhibits massive

habitat vegetative deformation and disease, indicative of significant adverse listed affect,

including death, (Doc 1, p 185-187). In the case of the affinis Plaintiff shows glyphosate

exposure, in addition to reproduction and gut microbiome destruction, also adversely

affects her navigational, foraging and nectar gathering abilities.[35] This would apply to the

other listed species invertebrates (insects), like the Spruce fir moss spider, which lives

within Roan's critical habitat. (Also see generally Plaintiff's 5/26/17, 4/30/18, 7/5/19 and

3/12/21 Notices and Allegations below.)

This Section 9 "take" aspect of Plaintiff's action arises out of the illegal

application on May/June 2017, June/July 2019 and one which is imminent June of 2021

by FBEMC in its usage of EPA registered herbicides, containing Glyphosate[36] and

Imazapyr, on or proximate to Roan Mountain N.C.. Said FBEMC application will just as

it has done previously "Take" a plethora of protected species and destroy their habitats in

violation of ESA § 9.[37] Importantly, it will prevent habitats which are healing from

---

[34] See Doc 1, p 83, 165, 182, 184-194

[35] Doc 1, p 209 - 210, citing among other references. *Effects of sublethal doses of glyphosate on honeybee navigation,* July 2, 2015
https://www.boerenlandvogels.nl/sites/default/files/Effects%20of%20Glyphosate%20on%20Honey%20Bee%20Navigation.pdf

[36] EPA has numerous registered pesticides/herbicides containing Glyphosate, https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0004. Two of its more popular ones include *Rodeo* manufactured by Dow Chemical, EPA Registration No. 62719-324, and Monsanto's/Bayer's Glyphosate herbicides *Roundup Original,* EPA Registration No. 524-445 and *Roundup Custom*, EPA Registration Number: 524-343. Likewise, Imazapyr is the active ingredient of *Polaris,* manufactured by Nufarm, EPA Reg. No. 228-534.

[37] Plaintiff's evidence shows accumulated load effect (repetitive exposure), where if not outright fatal in the first exposure, each additional exposure progressively increases destructive effect to a point of species extinction, see 1:19-cv-00226-MOC-WCM Doc 29, p 69 ¶ 46 ("In other words, I'm also seeing the same accumulative negative effect in the environment outside. Each successive spraying event appears to have a negative non-

healing. This has been set forth in abundant detail in Plaintiff's prior Notices, pleadings and in his 7/25/19 TRO PPT presentation.

It is noted while there's Roan agricultural and residential use of Glyphosate, detrimental enough to listed species, FBEMC's total spraying area and applied concentrations exponentially dwarf their load by orders of magnitude. For example, FBEMC has an estimated 200 miles of ROW easements *surrounding* and extending *up into* Roan, which are all more or less simultaneously sprayed at once with hydrous drift then migrating into listed species habitat for many months. Each easement provides FBEMC a 40' wide ROW under its power lines. This equates (assuming a full spray) into about 42.24 million square feet or 880 football fields worth of treated area, again all applied in a short time. The glyphosate concentrations of FBEMC's ROW applications are significant higher than agricultural or residential uses (Doc 1, p 23).

The enormity of this instantaneous mountain wide spraying event, presenting an overwhelming sudden toxic load, is unfathomable, particularly in view of ongoing hydrous drift (cite). Based upon Plaintiff's experience *both* before and after FBEMC's spraying, the adverse listed species habitat affect is infinitely beyond anything what any agricultural or neighbor below might do, at least 400 to 1000 times more. The shock to the entire mountain and its plethora of listed species, results in their death, is

---

linear damaging response. It's like the damaging effect is accelerating, where the environment is collapsing at a faster rate than the previous spraying event. The change is not linear and this is scary!").

overwhelmingly devastating and constitutes a monumental § 9 Take.[38] This monumental

Take will be amply proved at trial by Plaintiff's Rule 702 scientific experts.

Importantly, this action further arises from EPA's failure to consult with

USFWLS under 16 U.S.C. § 1536 (a)(2), which was triggered on multiple occasions by

EPA affirmative discretionary acts that "might" inure to the benefit of listed species,

including acts taken during EPA's current re-registration of Glyphosate. They include but

are not limited to EPA's 1/22/20 *Interim Registration Review Decision*[39] and its 11/20/20

*Draft National Level Listed Species Biological Evaluation (BE) for Glyphosate*

("*Biological Evaluation*"), https://www.epa.gov/endangered-species/draft-national-level-

listed-species-biological-evaluation-glyphosate; draft biological opinion,[40] (See further

discussion below.)

Because EPA is *now* required to consult due to said triggering acts (as discussed

below) this manifestly implicates 16 U.S.C. § 1536 (d) intended to preserve the "status

---

[38] Plaintiff notes the District Court dismissal order (Doc 53) in *191* is largely silent on FBEMC's Take.

[39] https://www.epa.gov/ingredients-used-pesticide-products/interim-registration-review-decision-and-responses-public, ("*Interim Registration Review Decision*")

[40] EPA expressly discloses glyphosate's likely adverse affect (LAA) for listed species and critical habitat, see its APPENDIX 4-1. Species Effects Determination Tables (XLSX), https://www3.epa.gov/pesticides/nas/glyphosate/appendix-4-1.xlsx (discloses glyphosate likely adversely affects [LAA], modifies critical habitat of approximately 759 endangered species, of which about 96% of species are critical habitat designated. Further discloses the Bombus affinis is also likely adversely affected), also see https://biologicaldiversity.org/w/news/press-releases/epa-finds-glyphosate-likely-injure-or-kill-93-endangered-species-2020-11-25/ ("The long-anticipated draft biological evaluation released by the agency's pesticide office found that 1,676 endangered species are likely to be harmed by glyphosate, the active ingredient in Roundup and the world's most-used pesticide. The draft biological opinion also found that glyphosate adversely modifies critical habitat for 759 endangered species, or 96% of all species for which critical habitat has been designated.")

quo" of listed species, if their is any ongoing 1536 (a)(2) consultation or one which is required.

## SECTION 7 CONSULTATION TRIGGER ACTS BY EPA

The ESA reflects a conscious decision by Congress to give endangered species **priority over** the primary missions of federal agencies.

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) (emphasis added)

Below is a partial listing of EPA's *affirmative discretionary acts,* [41] [42] which in each case **inured** in some capacity to the benefit of or which otherwise "may" have lent themselves to potentially affect[43] listed species and critical habitat,[44] where each act was either made in furtherance of sustaining its original 1974 glyphosate registration and/or in its current re-registration, each triggering § 7 Consultation:

- Approving and Publishing 1974 EPA *Registration of Glyphosate*, https://www.epa.gov/ingredients-used-pesticide-products/glyphosate, (also cited by the District Court, Doc 53, p 9);[45] [46]

---

[41] These are published on EPA's or other official government web sites.

[42] The ESA implementing regulations provide that Section 7 applies only to actions "in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03.

[43] *Karuk Tribe Of California v. U.S. Forest Service* 681 F.3d 1006, 1024, 1027 (2012) ("We have previously explained that **'may affect' is a 'relatively low' threshold for triggering consultation.** `**Any possible effect, whether beneficial, benign, adverse or of an undetermined character,' triggers the requirement** (emphasis added).")

[44] *Id., at* 1027 ("An agency has a duty to consult under Section 7 of the ESA for **any** discretionary agency action that **"may affect"** a listed species or designated critical habitat. *Turtle Island,* 340 F.3d at 974 (citing 50 C.F.R. § 402.14(a))."

[45] *Center for Biological Diversity v. EPA*, No. 14-16977, p 29 (9th Cir. 2017) (""Because [the] EPA has continuing authority over pesticide regulation, it has a continuing obligation to follow the requirements of the ESA."); *Forest Guardians v. Johanns*, 450 F.3d 455, 464–65 (9th Cir. 2006) (explaining agencies' ongoing duty to reinitiate ESA consultation)").

[46] https://www3.epa.gov/pesticides/nas//final/chlorpyrifos/chapter1.docx ("After registering a pesticide, EPA retains discretionary involvement and control over such registration.")

[46] Also see *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1250 (9th Cir.1984)

- Approving and publishing September 1993 EPA *Reregistration Eligibility Decision (RED) for glyphosate herbicides*, https://archive.epa.gov/pesticides/reregistration/web/pdf/0178fact.pdf;

- Conducting, publishing and taking Public Comments on its 9/8/15 *Registration Review - Preliminary Ecological Risk Assessment for Glyphosate and Its Salts*. US EPA (2015) Registration Review ("9/8/15 *Registration Review* "), https://downloads.regulations.gov/EPA-HQ-OPP-2009-0361-0077/content.pdf, posted Feb 28, 2018, https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0077;[47] [48]

---

[47] This particular discretionary act is discussed in Plaintiff's 4/30/18 Notice (Doc 1, p 112-115), where EPA repeatedly acknowledges "uncertainty," (Doc 1, p 112-113), thus mandating the "precautionary principle'" (e.g. § 7 Consultation) in order to avoid any "take" under ESA (see Plaintiff's discussion in Doc 1, p 112-115). Plaintiff expressly states EPA's "**uncertainty** cannot be ignored in regard to fragile ESA critical habitat," (Doc 1, 113) and cites 16 U.S.C. § 1536, (Doc 1, p 116, Footnotes 22 and 23). EPA had to know glyphosate would affect listed species, because on page 2 of its 9/8/15 *Registration Review,* EPA states*:*

> "☐ **Exposure to glyphosate** residue in water resulting from spray drift or application to aquatic environments **may impact** survival and/or biomass of aquatic emergent vascular and **nonvascular plants** (application to aquatic environments only) in surface waters adjacent to a treated field or in the treated water body.
> ☐ While acute adult contact and oral and semi-field **honeybee toxicity** data are available which **suggest toxicity** from glyphosate exposure is low, the calculated EECs are greater than highest concentrations tested in **honeybee toxicity** tests. Due to lack of toxicity data conducted at higher test concentrations, **it is unclear if exposure to glyphosate residues on foliage resulting from direct deposition or spray drift** at application rates 2'1.92 lb a.e./A **could impact survival, growth and/or reproduction of honeybee larvae**. Also due to lack of **toxicity data** at higher test concentrations, **it is uncertain** if there **could be potential acute effects** to **adult honeybee** at application rates >5.7 lb a.e./A. Additional toxicity studies with other types of terrestrial invertebrates (i.e., predatory mites, earthworms, parasitic wasps) are also available, with generally no effects reported up to the highest dose tested. In a study with a predatory mite, the 7-d LD50 value was reported as 1200 g a.e./ha (1.1 lb/A) (MRID 45767105)
> ☐ **Exposure to glyphosate** residues on foliage resulting from direct deposition or spray drift **may impact** growth of **birds** for all uses (surrogates to terrestrial-phase **amphibian**), but may not impact reproductive parameters.
> ☐ **Exposure to glyphosate residues** on foliage resulting from direct deposition or spray drift **may impact** growth and reproduction to **terrestrial mammals** for aerial application to sugar cane as well as for most uses generally applied by ground application
> up to the combined maximum annual rate.

- Conducting and publishing 4/28/16 *Registration Review--Preliminary Ecological Risk Assessment for Glyphosate and Its Salts* (PC Codes: 417300, 103601, 103604, 103607, 103608, 103613, 103603, 103605, 128501; DP Barcode: 417701), posted Apr 28, 2016, https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0056;

- Preparing, Communicating, *Meeting December 13-16, 2016 and Then Transmitting Meeting Minutes and Final Report RE: Considering and Review of Scientific Issues Associated with EPA's Evaluation of the Carcinogenic Potential of Glyphosate To Acting Director Office of Pesticides 3/16/2017*, https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf;[49]

- Conducting and publishing *December 2017 the Draft Glyphosate Human Health And Ecological Risk Assessments for Public Comment* (cited by the District Court, Doc 53, p 9);[50]

- Conducting, publishing and taking Public Comments on its 2/27/18 *Draft Human Health and Ecological Risk Assessments for Glyphosate*, https://www.epa.gov/ingredients-used-pesticide-products/draft-human-health-and-ecological-risk-assessments-glyphosate; https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0066;

---

☐ **Exposure to glyphosate residues** on foliage resulting **from spray drift may impact survival** and/or biomass of **upland plants** and **riparian/wetland plants** in areas adjacent to treated field (Emphasis added)."

In other words, if the honey bee may be negatively affected, why wouldn't its listed species cousin, the *Bombus affinis,* which is environmentally much more sensitive (Doc 1, p 119 -143)? (Also see *Allegations* below.)

[48] On 11/21/2018 EPA published its Response to Public Comments of its Sept. 8, 2015 *Preliminary Ecological Risk Assessment for Glyphosate*, see https://www.epa.gov/sites/production/files/2019-04/documents/glyphosate-signed-efed-rtc.pdf

[49] See Doc 28, p 34 FN 24. In this report of a December 13-16, 2016 meeting, EPA's underlying methodology was called into question by a key EPA scientific panel, which raised **epidemiologic and genotoxicity animal** study concerns, concluding EPA failed to follow its own guidelines; https://sustainablepulse.com/2017/12/20/epa-relies-on-industry-studies-to-give-glyphosate-new-green-light/#.WuCqoy7wYr9. In other words, whatever EPA's findings of "affect" upon tested species may be, its conclusions are suspect due to its methods, and much like EPA's 9/8/15 Registration Review raising "uncertainly," this invokes the precautionary rule requiring § 7 consultation.

[50] This was cited by the Court (Doc 53, p 8-9), but likely a reference to the same titled *Registration Review - Preliminary Ecological Risk Assessment for Glyphosate and its Salts,* Posted Feb 28, 2018.

24

- Conducting, publishing and taking Public Comments on its *Registration Review - Preliminary Ecological Risk Assessment for Glyphosate and its Salts,* Posted Feb 28, 2018, https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0077 ;[51]

- Conducting and publishing EPA's 11/21/18 *Response to Public Comments on the Preliminary Ecological Risk Assessment for Glyphosate*, https://www.epa.gov/sites/production/files/2019-04/documents/glyphosate-signed-efed-rtc.pdf;[52]

- "In April 2019, after reviewing the public comments on the risk assessments, EPA released its Glyphosate Proposed Interim Decision for public comment, which closed on September 3, 2019 https://www.epa.gov/ingredients-used-pesticide-products/proposed-interim-registration-review-decision-and-responses-0," (also cited by the District Court, Doc 53, p 9);

- Conducting, making, publishing and seeking Comments of its May 6, 2019 *Glyphosate Proposed Interim Registration Review Decision* Case Number 0178, https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-2344;[53] [54]

- Conducting and publishing EPA's issuance of its glyphosate interim-registration, posted 1/20/20, https://www.epa.gov/ingredients-used-pesticide-products/interim-registration-review-decision-and-responses-public;[55]

---------------------

[51] Plaintiff submitted his 4/30/18 Notice/Comment during this open comment period, which closed 4/30/18.

[52] See EPA's acknowledgment of its review of the 11/21/18 Response to Public Comments on the Preliminary Ecological Risk Assessment for Glyphosate, https://www.epa.gov/sites/production/files/2019-04/documents/glyphosate-signed-efed-rtc.pdf, ("The Environmental Fate and Effects Division (EFED) has completed its review of public comments received on the Preliminary Ecological Risk Assessment (PRA; USEPA 20151 ) for the herbicide, glyphosate");

[53] https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-2344, p 27 ("**Potential risk to terrestrial invertebrates is uncertain**, as acute contact and oral **honeybee**"), p 28 ("**Additional data may be necessary** to fully evaluate risks to non-target terrestrial invertebrates, **especially pollinators**... EPA is currently determining whether additional **pollinator data are needed for glyphosate**"), p 29 ("Given its [milkweed] importance as a critical food resource for the **monarch butterfly**, the agency also completed a spray drift analysis for common milkweed'). Like its 9/8/15 *Registration Review* EPA acknowledges risk to the honeybee and by inference the much more sensitive *Bombus affinis*. Furthermore, EPA's disclosure of the monarch butterfly, which is warranted listed species status (see https://www.fws.gov/savethemonarch/SSA.html) and milkweed (its food source), clearly shows EPA's May 6, 2019 *Glyphosate Proposed Interim Registration Review Decision* inures to the benefit of listed species.

[54] Plaintiff submitted his 7/5/19 Notice/Comment (Doc 1, p 160-217) during this open comment period.

- On January 22, 2020, EPA released its *Interim Registration Review Decision on Glyphosate*. See https://www.epa.gov/ingredients-used-pesticide-products/interim-registration-review-decision-and-responses-public, ("*Interim Registration Review Decision*") (cited by the District Court, Doc 53, p 9);

- Conducting, publishing and taking Public Comments of EPA's *11/20/20 Draft National Level Listed Species Biological Evaluation (BE) for Glyphosate* ("*Biological Evaluation* "), https://www.epa.gov/endangered-species/draft-national-level-listed-species-biological-evaluation-glyphosate; draft biological opinion;[56]

- Conducting, publishing and in certain cases taking Public Comments on **numerous** glyphosate studies/assessments wherein potential species risk was disclosed, inferred or suggested, as set forth in[57] https://www.regulations.gov/docket/EPA-HQ-OPP-2009-0361/document

    The above partial listing of EPA's *affirmative discretionary acts* triggering § 7

consultation, with exception of its initial 1974 registration, have been in furtherance of

EPA's current glyphosate re-registration. Several of these were disclosed in Plaintiffs

Notices, including but limited to EPA's 9/8/15 *Registration Review* in Plaintiff's 4/30/18

---

[55] EPA's 1/20/20 *interim Registration* expressly acknowledged potential species risk, see p 3 ("to implement an interim approach for assessing **potential risk** to listed species and their designated critical habitats."), p 20 ("Although the agency is not making a complete endangered species finding at this time, the mitigation described in this document is expected to reduce the extent of environmental exposure and **may reduce risk** to listed species whose range and/or **critical habitat** co-occur with the use of glyphosate (emphasis added).").

[56] It is important to note **EPA expressly discloses likely adverse affect (LAA) for listed species and critical habitat**, see its APPENDIX 4-1. Species Effects Determination Tables (XLSX), https://www3.epa.gov/pesticides/nas/glyphosate/appendix-4-1.xlsx (discloses glyphosate likely adversely affects [LAA], modifies critical habitat of approximately 759 endangered species, of which about 96% of species are critical habitat designated. Further discloses the Bombus affinis is also likely adversely affected), also see https://biologicaldiversity.org/w/news/press-releases/epa-finds-glyphosate-likely-injure-or-kill-93-endangered-species-2020-11-25/ ("The long-anticipated draft biological evaluation released by the agency's pesticide office found that 1,676 endangered species are likely to be harmed by glyphosate, the active ingredient in Roundup and the world's most-used pesticide. The draft biological opinion also found that glyphosate adversely modifies critical habitat for 759 endangered species, or 96% of all species for which critical habitat has been designated.")

[57] EPA's site discloses 71 references of agency action in its re-registration, https://www.regulations.gov/docket/EPA-HQ-OPP-2009-0361/document

Notice (Doc 1, p 111-115), EPA's 1/22/20 *Interim Registration* and its 11/22/20 *Biological Evaluation* (BE)[58] in Plaintiff's 3/21/21 Notice.[59]

    At each stage, in each action by EPA, EPA's action had some capacity to inure to the benefit[60] or otherwise lend itself to potentially affect listed species and critical habitat.[61] This action need not be direct,[62] because they each contributed in a process where EPA **would** consider re-registering a herbicide and did so in its *Interim Registration.* As Courts have explained, "actions that have **any** chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—**require** at least some consultation under the ESA," *Karuk Tribe*, 681 F.3d at 1027 (emphasis added).

---

[58] EPA's 11/20/20 draft "Biological Evaluation" assessing risks to listed species from labeled uses of glyphosate is an "effects determination" that EPA, as the action agency, must make before taking an action, 50 C.F.R. § 402.14(a). If EPA determines that its action "may affect" any listed species or critical habitat, it must consult with USFWLS. Also see 50 C.F.R. §§ 402.02; 402.14(a); 402.14(h)(3), (i) and requisite studies, 7 U.S.C. § 136a(c)(2)(B); 40 C.F.R. § 155.40(c)(2).

[59] Attachment 3, p 15 ("EPA issued its interim registration and its instant Evaluation, absent undertaking said mandated Section 7 consultation, in flagrant violation of the ESA."), 16 ("This is again in addition to the agency's interim rule admitting that its existing interim registration already "may affect" protected species and their habitats, even absent consideration of hydrous drift or Section 7 USFWLS consultation (citing an omitted footnote to EPA's *9/8/18 Registration Review*), p 36 ("EPA knows its interim registration action triggers the low bar **"may affect"** threshold requiring ESA Section 7 Consultation (emphasis in original).

[60] *Wash. Toxics Coal. v. EPA,* 413 F.3d 1024, 1033 (9th Cir. 2005) (See *Allegations*).

[61] *Karuk*, at 1027

[62] *Turtle Island Restoration Network v. National Marine Fisheries Service*, 340 F.3d 969, 974 ("Section 7(a)(2) of the ESA imposes a procedural duty on federal agencies to consult with either the Fisheries Service or the FWS **before** engaging in a discretionary action, which **may** affect listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14, 402.01(b) (emphasis added).")

Putting this into prospective, EPA **finally** after 38 years after its RED, did finally acknowledge in their 1/20/20 *Interim Registration* and 11/25/20 *Biological Evaluation* [63] glyphosate **does** likely adversely affect listed species and critical habitat.[64] So, we're lead to believe after 38 years of conducting, publishing its numerous specie and ecological assessments/reviews and taking other acts, EPA has just now realized glyphosate may likely adversely affect listed species and critical habitat. In other words, EPA seems to be suggesting there hasn't been any agency act during this entire period up until now, which EPA determined initiate § 7 consultation. This is laughable!

Each of EPA's earlier species assessments, ecological and similar reviews (like its 9/8/15 *Registration Review*, (see FN 47 above) all implicated listed species and critical habitats, because listed species are much more fragile/sensitive than non-listed species, Doc 1, p 111 (As shown in these [4/30/18] Comments the prognosis for large genome protected species is dire once **any** level of GCH contamination has been introduced.")

This is a well known scientific fact,[65] which EPA well knows. Again, if EPA's 9/8/15 *Registration Review* shows a honey bee adversely affected and many others do as well,[66] it also shows its native species counterpart - the much more sensitive listed

---

[63] https://www.epa.gov/endangered-species/draft-national-level-listed-species-biological-evaluation-glyphosate; draft biological opinion
[64] See FN 55, *supra*
[65] See *Genome size and extinction risk in vertebrates,* Alexander E. Vinogradov, 7/14/2004, which disclose listed species are typically higher genome species. See Plaintiff's 4/30/18 Notice (Doc 1, p  ) and *Allegations,*
[66] *Study Shows Honeybees Are Starving Because Of Roundup,* http://www.glyphosate.news/2016-06-27-study-shows-honeybees-are-starving-because-of-roundup.html; *Groundbreaking study shows that Roundup causes honeybees to starve,* http://www.naturalnews.com/046769_Roundup_honeybees_colony_collapse_disorder.html; *Effects of sublethal doses of glyphosate on honeybee navigation,* https://www.ncbi.nlm.nih.gov/pubmed/26333931; *Glyphosate perturbs the gut microbiota of honey bees,* https://www.pnas.org/content/115/41/10305.short ("The

Bombus affinis affected. This means its almost 6 year old. Thus, EPA's 9/8/15 *Registration Review* inured to the benefit of a listed species, *Karuk*, at 1024 ("To trigger the ESA consultation requirement, the discretionary control retained by the federal agency also must have the capacity to inure to the benefit of a protected species.")

It was EPA's duty to give **priority** to listed species over its primary mission, **not** non-listed species, *Tenn. Valley Auth.* at 185 ("the legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species **priority over the "primary missions"** of federal agencies (emphasis added).")

In short, EPA cannot give non-listed species decades long priority over listed species in its evaluations/reviews/studies and pretend they don't apply to list species. This failure to give listed species a priority **itself** constitutes a discretionary triggering act, not only because its EPA duty under ESA, but because it's evidence of EPA's delay or withholding of requisite § 7 consultation, *Missouri v. Secretary of the Interior*, 158 F. Supp. 2d 984, 990 (W.D. Mo. 2001); *Sierra Club v Thomas*, 828 F.2d 783, 793-795 (DC Cir 1987)

---

herbicide glyphosate is expected to be innocuous to animals, including bees, because it targets an enzyme only found in plants and microorganisms. However, bees rely on a specialized gut microbiota that benefits growth and provides defense against pathogens. Most bee gut bacteria contain the enzyme targeted by glyphosate, but vary in whether they possess susceptible versions and, correspondingly, in tolerance to glyphosate. Exposing bees to glyphosate alters the bee gut community and increases susceptibility to infection by opportunistic pathogens."); *Roundup: What Impact Does this Herbicide Have on Bees and Food?*, http://www.honeysolutions.com/roundup-what-impact-does-this-herbicide-have-on-bees-and-food/

EPA's numerous ecological and biological reviews/assessments from its 1974 registration and from it 1993 RED to present predominate non-listed species, including humans, where results again easily infer an affect more sensitive higher genome listed species (again the honey bee and the Bombus affinis), which mandated § 7 consultation. But, it never occurred!

The enormity of the injury suffered by listed species during this 38 year epic EPA failure **is incalculable,** *Tennessee Valley* at 178, 187.[67] Plaintiff Notices, prior pleading and 7/25/19 TRO PPT presentation have demonstrated this injury on Roan. EPA's continuing catastrophic failure cannot be what the Congress contemplated in passing the ESA where ESA's **"language admits of no exception,"** *Tennessee Valley Auth*. at 173, especially where the protection of listed species is the agency's **"first priority," a "priority over the 'primary missions,'"** *Id.,* at 185.

Furthermore, it's not required that EPA foresaw there would be a listed species affect in any of its discretionary acts,[68] obviously since they've obviously not seen one for

---

[67] Plaintiff's evidence shows accumulated load effect (repetitive exposure), where if not outright fatal in the first exposure, each additional exposure progressively increases destructive effect to a point of species extinction, see Doc 29, p 69 ¶ 46 ("In other words, I'm also seeing the same accumulative negative effect in the environment outside. Each successive spraying event appears to have a negative non-linear damaging response. It's like the damaging effect is accelerating, where the environment is collapsing at a faster rate than the previous spraying event. The change is not linear and this is scary!"). Now imagine 38 years worth of accumulated exposure. In Plaintiff's view, some listed species may have gone extinct due to prolonged exposure.

[68] Plaintiff's 4/30/18 Notice cites known science (which EPA had to be know) that listed species have higher genomes and thus much higher sensitivities than lower genome species (like humans), e.g. higher genome listed species will likely be sensitive to pesticides while lower genome species may **not** (Doc 1, p 109 - 157; Id., p 109 ("These systems and species often have vastly greater amounts of genetic material (genomes) compared to humans. This makes them more intelligent, more sensitive than humans relative to their own environment (habitat), e.g. their phenotype character. Thus, maintenance of the "absolute" purity and original state of their habitats must be assured, in order for their ongoing survival. The slightest disturbance in the purity or in original state of their habitat becomes an extinction risk."), *Id.*, p 130 ("Thus, EPA's relied upon GCH's [glyphosate based herbicides] studies of mammals/humans having lower genome sizes than protected species are inapposite for assessing the risk under ESA.").

38 years. Yet, all the while since its original 1974 registration continued and now its interim registration while EPA's continued self induced blindness to listed species have resulted in their wholesale slaughter. Thus, under the "may affect" precautionary principle[69] the Agency's discretionary acts need not be seen by the Agency to inure to the benefit of listed species to trigger § 7. *Tennessee Valley* at 168 ("'the detrimental impact of a project upon an endangered species may not always be clearly perceived before construction is well underway.'")

EPA's 1993 RED was the first in this series of triggering acts undertaken in EPA's registration process mandating ESA Section 7 consultation, *Center for Biological Diversity v. EPA*, No. 14-16977 (9th Cir. 2017), 20- 21 said "**We assume**, but do not hold, that the EPA's issuance of a RED [Reregistration Eligibility Decision] is an agency action that triggers ESA Section 7 consultation (emphasis added).)"

Because the RED was the first step in EPA's determinative process in deciding whether sufficient environmental/ecological safety existed to warrant registration,[70] at each step EPA was obligated to review at the "earliest possible time" rather its action under ESA **may** affect listed species or their habitat. *Ellis v. Housenger,* 252 F.Supp.3d 800, 815 (2017) ("'[e]ach federal agency' is required to '**review** its actions at the **earliest possible time** to determine whether any action may affect listed species or critical habitat,' (emphasis added"), 50 C.F.R. § 402.14(a).

---

[69] *Center for Biological Diversity v. EPA*, No. 14-16977, p 37
[70] See *Center for Biological Diversity v. EPA*, No. 14-16977, p 17-18 ("As part of the approval process, the EPA conducts an analysis... [in] that analysis, the EPA must consider what are known as Paragraph 5 requirements provided in 7 U.S.C. § 136a(c)(5)... If the EPA determines that a pesticide product does not 'increase the risk of unreasonable adverse effects on the environment' and satisfies the Paragraph 5 requirements, the EPA 'shall register' that pesticide product. (internal citations omitted).")

Thus, each affirmative agency act, absent exception, which started from the RED, no matter how inconsequential or minor,[71] which could have, "may" have had in anyway affected or inureed to the benefit of a listed species, triggered § 7 consultation, because in a registration process the benefit of the doubt goes to the listed species, especially in any close calls.[72] [73]

The plethora of evidence during EPA's glyphosate re-registration showing "take" and adverse affect of listed species is staggering. EPA has it and is certainly aware of it. Plaintiff showed it to EPA in his several Comments (each made during public comment) and certainly many other Commentators did as well. Yet, EPA failed to act on it as if it had blinders on.

Given EPA's presumptive § 7 duty, and given the stark amount of evidence of adverse listed species affect known to EPA, and given the many discretionary triggering acts mandating § 7 consultation where the agency simply did not act, did EPA's delay or its withholding of § 7 consultation **itself** constitute an affirmative discretionary act? See *Missouri v. Secretary of the Interior*, 158 F. Supp. 2d 984, 990 (W.D. Mo. 2001); *Sierra Club v Thomas*, 828 F.2d 783, 793-795 (DC Cir 1987)?

---

[71] This "no exception" doctrine goes beyond merely "deciding" to take an action, see *Tenn Valley* at 173 FN 18 (The majority stating "This language admits of no exception" goes on to cite FN 18 "In dissent, MR. JUSTICE POWELL argues that the meaning of "actions" in § 7 is "far from *plain,'" and that* "it seems evident that the 'actions' referred to are not all actions that an agency can ever take, but rather actions that the agency is *deciding whether* to authorize, to fund, or to carry out.")

[72] *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 680 (D.D.C. 1997) (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (explaining the principle of institutionalized caution at the heart of the ESA means giving "benefit of the doubt" to species), *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985).

[73] It's undisputed individual registrations trigger consultation (*Center for Biological Diversity*, p 5) and there have been many for glyphosate, see
https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0004

Did this agency inaction or delay also violate the clear intent of § 1536? *Ellis v. Housenger,* 252 F.Supp.3d 800, 815 (2017).

Did EPA's inaction/delay **itself** <u>**also**</u> constitute an illegal "take"? *Grand Canyon Trust v. U.S. Bureau of Reclamation* (9th Cir. Case No. 11-16326), p 6 ("The ESA also prohibits the acting agency from "taking" a threatened or endangered species in the course of the agency action. 16 U.S.C. § 1538(a)(1)(B), (G)"), Pub. L. No. 93-205, § 9, 87 Stat. at 893-94 (codified as amended at 16 U.S.C. § 1538 (2012).[74]

In any event, EPA's 11/22/20 *Biological Evaluation* (BE), 16 U.S.C. § 1536 (c), which is not a final Agency action nor an order subject to FIFRA jurisdiction under purely ESA claims; instead it **initiates** the process leading to a Biological Opinion § 1536 (b) and thus is within the gambit of § 1536 (a) Consultation. Hence, Plaintiff submits EPA's BE and its admission of likely adverse affect of listed species and critical habitat **triggers** the § 1536 (a)(2) consultation process.

## FIFRA DOES NOT CONTROL DISTRICT COURT INJUNCTIVE JURISDICTION

Plaintiff submits FIFRA cannot be used to emasculate the principal tool of ESA, namely the **Injunction** (1540(g)(1)(A)), nor emasculate the jurisdiction of the District Court employing that tool (ESA 1540(g)(A)), particularly when Chapter 1540(c) governing Citizen suit **expressly** provides "The several **district courts** of the United States... **shall have jurisdiction** over any actions arising under this chapter (emphasis added), *Turtle Island v. National Marine,* 340 F.3d 969, 975.

---

[74] EPA's never ending registration process (38 years and going) entirely absent § 7 consultation permitted FBEMC and no doubt countless others to use glyphosate to destroy listed species and critical habitat.

This manifest intent could not be clearer, despite EPA's registration of pesticides

under FIFRA, in view of REPORT No. 93-307, ENDANGERED SPECIES ACT OF

1973 REPORT OF THE SENATE COMMITTEE ON COMMERCE ON S. 1983, U.S.

GOVERNMENT PRINTING OFFICE WASHINGTON: 1973, Senate Report REPORT

OF THE SENATE COMMITTEE ON COMMERCE ON JULY 1, 1973, June 30, 1973,

Mr. MAGNUSON, Committee on Commerce,

https://nctc.fws.gov/courses/csp/csp3116/resources/ESA_Section_7_Legislative_History/

Part_1_pages_298-341.pdf

> g) CITIZEN SUITS.-(l) Except as provided in paragraph (2) of
> this subsection, any person may commence a civil suit on his own behalf
> **to enjoin** any person, including the United States and any other
> governmental instrumentality or agency (to the extent permitted by the
> eleventh amendment to the Constitution), who is alleged to be in violation
> of any provision of this Act or regulation issued under the authority
> thereof. **The <u>district courts</u> shall have jurisdiction**, without regard to the
> amount in controversy or the citizenship of the parties, **to enforce any
> such provision or regulation, as the case may be**.

Id, at p 326 (emphasis added)

Furthermore, passage of 1973 ESA anticipated the threat of pesticides and FIFRA

(which existed and had undergone several amendments by 1973), see the Congressional

Record, Sept. 18, 1973 re: HOUSE CONSIDERATION AND PASSAGE OF H.R. 37,

WITH AMENDMENTS ENDANGERED AND THREATENED SPECIES

CONSERVATION ACT OF 1973,

https://nctc.fws.gov/courses/csp/csp3116/resources/ESA_Section_7_Legislative_History/

Part_1_pages_180-207.pdf, Mrs. Sullivan at 192 ("The destruction may be intentional...

or it may be unintentional, as in the case of the spread of **pesticides** beyond their target

area. Whether it is intentional or not, however, the result is unfortunate for the species of

animals that depend on that habitat, most of whom are already living on the edge of survival (emphasis added).")

FIFRA, the Federal Insecticide, Fungicide, and Rodenticide Act controlling pesticide registrations was passed in 1947, amending the Federal Insecticide Act of 1910, 7 U.S.C. § 136 et seq.. It existed in 1973 and has undergone various amendments, the latest found by Plaintiff 12/12/19. Thus it was known to Congress in enacting ESA, https://libraryguides.law.pace.edu/c.php?g=892839&p=6420364. No amendments could be found that **expressly** amended ESA 1540(g)(A). And, unless there is an express amendment modifying ESA 1540(g)(A) in FIFRA, it does not apply, see *Tennessee Valley* where the Supreme Court wrestled with this same issue, whether or not subsequent legislation in conflict with ESA undermined it's legislative intent regarding enforcement of § 7. It held it did not, that ESA was superior, *Id.*, at 189-190 ("*Posadas*, this Court held, in no uncertain terms, that "the intention of the legislature to repeal must be clear and manifest." Ibid. See *Georgia v. Pennsylvania R. Co.*, 324 U. S. 49, 324 U. S. 456-457 (1945) ("Only a clear repugnancy between the old... and the new [law] results in the former giving way..."); *United States v. Borden Co.*, 308 U. S. 188, 308 U. S. 198-199 (1939) ("[I]ntention of the legislature to repeal `must be clear and manifest'... `[A] positive repugnancy [between the old and the new laws]'"). Thus, FIFRA cannot be applied to defeat § 7.

Again, not withstanding pesticide registration and FIFRA, EPA's overriding **priority** mission under ESA is to protect listed species. FIFRA cannot diminish that priority, *Karuk Tribe Of California v. U.S. Forest Service* 681 F.3d 1006, 1024 (2012)

("An agency 'cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives.'")

Use of the **Injunction** is "The" citizen weapon under ESA 1540(g)(1)(A).

"(g) Citizen suits
(1) Except as provided in paragraph (2) of this subsection **any person may commence a civil suit on his own behalf -**
**(A) to enjoin any person**, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof...(emphasis added)"

ESA 1540(g)(A) (emphasis added)

The legislative intent to employ injunctive relief could not be clearer.

(f) This subsection authorizes citizen actions to enforce the provisions of the Act. It allows any person, including a Federal official, to seek remedies involving **injunctive relief** for violations or potential violations of the Act. The language is parallel to that contained in the recent Marine Protection, Research and Sanctuaries Act of 1972, and is to be interpreted in the same fashion (emphasis added).

7/27/73 HOUSE CONFERENCE REPORT 93-310 On ENDANGERED AND THREATENED SPECIES CONSERVATION ACT OF 1973, p 158, https://nctc.fws.gov/courses/csp/csp3116/resources/ESA_Section_7_Legislative_History/ Part_1_pages_140-179.pdf, at 158, Mrs. SULLIVAN, Committee on Merchant Marine and Fisheries

Courts cannot evisceration this plain intent by super imposing FIFRA, which defeats that intent, *Turtle Island at* 975; *Chevron, U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842-43 (1984).

Clearly, ESA isn't just any ordinary legislation, *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 174, 180, 184, at 184 ("[T]he ESA was originally drafted in **absolute terms, providing no exceptions for the protection of qualified species.** (emphasis added)"), *Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir, 2005), at 1032 **("We agree with the Eighth Circuit that even though EPA registers pesticides under**

**FIFRA, it must also comply with the ESA when threatened or endangered species are affected**. *See id.* at 1299-1300. This conclusion is consistent with our own prior holdings that compliance with FIFRA requirements does not overcome an agency's obligation to comply with environmental statutes with different purposes... ESA affords endangered species the "highest of priorities" in assessing risks and benefits. The reasoning of our case law therefore leads us to conclude that **an agency cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives** (internal citations omitted, emphasis added).")

Furthermore, FIFRA commands EPA maintain its continuing obligation to ESA, *Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir, 2005), at 1033 ("EPA retains ongoing discretion to register pesticides, alter pesticide registrations, and cancel pesticide registrations. *See* 7 U.S.C. § 136a-d. Because EPA has continuing authority over pesticide regulation, it has a continuing obligation to follow the requirements of the ESA... EPA has similar discretion "to inure to the benefit" of listed species. Pesticide registrations under FIFRA are ongoing and have a long-lasting effect even after adoption. EPA retains discretion to alter the registration of pesticides for reasons that include environmental concerns. *See* 7 U.S.C. §§ 136d(c)(1)-(2), 136(*l*). Therefore, **EPA's regulatory discretion is not limited by FIFRA in any way that would bar an injunction to enforce the ESA** (emphasis added).")

Just as APA does not control Plaintiff's ESA injunctive relief, neither does FIFRA, *Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir, 2005) at 1034 ("The district court correctly held, however, that the ESA citizen suit provision creates an

express, adequate remedy. That provision states: "[A]ny person may commence a civil suit on his own behalf ... to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1). Because this substantive statute independently authorizes a private right of action, the APA does not govern the plaintiffs' claims. Plaintiffs' suits to compel agencies to comply with the substantive provisions of the ESA arise under the ESA citizen suit provision, and not the APA. *See, e.g., Pac. Rivers Council,* 30 F.3d at 1056; *Peterson,* 753 F.2d at 763-64.")

Plaintiff's instant claims are also distinguishable from those of *Center for Biological Diversity v. EPA*, 106 F. Supp. 3d 95, 99-100 (D.D.C. 2015) cited by the District Court in *226*. Namely, Plaintiff does not seek "to '[e]njoin, vacate, and set aside EPA's authorization of any use of [][glyphosate] that does-not include protections necessary to avoid harm to listed species, until such time as EPA has put in place adequate permanent measures that ensure against jeopardy to listed species or adverse modification of their critical habitat[.]'," *Id.*, at 99. Rather, Plaintiff merely seeks EPA's interim-registration be enjoined under § 1536 (d) until EPA has concluded its requisite § 7 consultation. This is a huge distinction. Plaintiff is not imposing any preconditions.

Nor, does Plaintiff assert FIFRA 7 U.S.C. § 136n(a) jurisdiction, unlike the *Center for Biological Diversity, Id.*, which raised "'an "unreasonable adverse effects on the environment[,]' 7 U.S.C. § 136a(a), and asked the Court to **overturn** the agency's Order," Id., at 100. To the contrary, Plaintiff's instant request does not seek to overturn EPA's Interim Registration, but again rather to enjoin it under § 1536 (d) until requisite §

1536 (a)(2) consultation has been concluded, or alternatively to enjoin its use by FBEMC

on Roan until § 1536 (a)(2) consultation has concluded, whatever the outcome of that

consultation.

In sum, EPA's 1/22/20 interim registration as others cited by Plaintiff merely a

trigger requiring § 7 consultation (*supra*), which respectfully does not provide FIFRA

overriding jurisdiction. Again, Plaintiff in this matter does not seek cancellation or

suspension of the registration, nor otherwise challenge its "validity" under 7 U.S.C. §

136n. It is noted EPA's interim-registration is not a final order,[75] nor a part of the FIFRA

process, 40 C.F.R. § 155.56.[76]

Plaintiff **does** assert EPA's 11/20/20 BE and its other discretionary acts, which are

clearly **not** an 7 U.S.C. § 136n (b) "order[s] issued by the Administrator," to trigger § 7

Consultation (*supra*). These are clearly outside what could be perceived FIFRA

jurisdiction. For purposes of instant Complaint it is the latter, which Plaintiff submits

gives the Court unquestionable jurisdiction under ESA outside FIFRA.[77] Furthermore,

Plaintiff's Take claims are entirely outside FIFRA and the Court can freely enjoin EPA

and FBEMC.

---

[75] *Beyond Pesticides/National Coalition v. Whitman*, 294 F.Supp.2d 1 (2003) at 8
FN 7 ("FIFRA's current judicial review provision permits review of the Administrator's
refusal to cancel or suspend a registration, refusal to change a classification, or "other
final actions." 7 U.S.C. § 136n")

[76] EPA's "Interim" registration is not part of FIFRA, but rather a creation of EPA, 40
C.F.R. § 155.56. EPA uses "interim" registrations to finalize parts of a registration, like
mitigation measures, or to identify needed data, like through a Data Call-In pursuant to
FIFRA Section 3(c)(2)(B), *Id.* Here, EPA "finalized" its mitigation measures, and the
health and ecological risk assessments, announcing that "[it] concluded its regulatory
review of glyphosate." See EPA Finalizes Glyphosate Mitigation (Jan. 30, 2020),
https://www.epa.gov/pesticides/epa-finalizes-glyphosate-mitigation.

[77] Plaintiff is not challenging "the validity of any order issued by the Administrator
following a public hearing," 7 U.S.C. § 136n (b).

## DISTRICT COURT HAS AUTHORITY TO ENJOIN EPA'S INTERIM REGISTRATION UNDER § 1536 (d)

Once either the Court enjoins EPA or if EPA has already commenced § 7 Consultation, which Plaintiff submits EPA's 11/20/20 BE under § 1536 (being the first step in the consultation process), mandates, the Court can employ § 1536 (d) to enjoin EPA's further use of the registration if it would take list species or significantly adversely affect their habitat, including critical habitat. EPA's forthcoming Biological Opinion (§ 1536 (b)), another part of the consultation process after it 11/20/20 Biological Evaluation (§ 1536 (c)), will no doubt will almost certainly conclude glyphosate significantly adversely affects listed species and critical habitat, particularly in view of Plaintiff's submitted 3/12/21 Notice made during EPA's BE comment period.

In sum, once § 1536 (a) Consultation is ordered by the Court or if EPA has really already commenced this process, the Court has jurisdiction under § 1536 (d) to enjoin the EPA from taking listed species or adversely affecting their habitats.

> After initiation of consultation required under subsection (a) (2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a) (2) of this section...

16 USC § 1536 (d)

> After initiation or reinitiation of consultation required under section 7(a)(2) of the Act, the Federal agency and any applicant shall make no irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives which would avoid violating section 7(a)(2). This prohibition is in force during the consultation process and continues until the requirements of section 7(a)(2) are satisfied. This provision does not apply to the conference requirement for proposed species or proposed critical habitat under section 7(a)(4) of the Act.

50 CFR § 402.09

> The consultation process becomes a sham...if an agency can make irreversible and irretrievable commitments of resources during consultation which foreclose the adoption of the very alternatives being discussed...

43 FED. REG. 870, 872-73 (Jan. 4,1978) (Final Regulation regarding interagency cooperation) (citation omitted).

> [t]he new section 7(c)(4)19[78] of the act would further strengthen the consultation process. It prohibits any Federal agency from making any irreversible or irretrievable commitment of resources once consultation has been initiated if such commitment would have the effect of foreclosing efforts to avoid the adverse impacts on the species or their critical habitat.

H.R. REP. No. 1625, 95th Cong., 2d. Sess. 3 (1978), reprinted in 1978 UNITED STATES CODE CONGRESSIONAL AND ADMINISTRATIVE NEWS 9453, note 10 at 20, (footnote added)[79]

Clearly§ 1536 (d) was designed to protect listed species during the interim period of a § 7 consultation process and EPA is expending resources continuing to allow its interim registration be used, not to mention the irreversible or irretrievable commitment of resources of the permit or license applicant(s), which are expending huge resources manufacturing, storing, transporting and selling glyphosate herbicides.

Plaintiff submits once the triggering act occurs, the § 7 consultation process commences, and hence § 1536 (d) controls, *Conner v. Burford* 848 F.2d 1441 (9th Cir, 1988) at 1452 ("Section 7(b) sets out a process of consultation whereby the agency with jurisdiction over the protected species issues to the Secretary a "biological opinion" evaluating the nature and extent of jeopardy posed to that species by the agency action.

---

[78] The precursor of § 7(d) appeared as § 7(c)(4) when House Bill 14104 was introduced. See LEGISLATIVE HISTORY, supra note 6, at 671. The Senate bill contained no similar provision. See id. at 905-17.

[79] For legislative history and background of § 7(d) see https://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1331&context=ealr

16 U.S.C. § 1536(b). The agency proposing the action (action agency) must provide the Secretary with "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). If the biological opinion concludes that the proposed action is likely to jeopardize a protected species, the action agency must modify its proposal. **In addition, section 7(d) forbids "irreversible or irretrievable commitment of resources" during the consultation process** (internal footnotes omitted, emphasis added)"). So importantly, the court has no discretion or authority to balance the equities so as to permit a violation to continue.[80]

The burden of proof whether EPA's continuing use of glyphosate under its interim registration jeopardizes listed species during § 7 consultation rests squarely with EPA.[81] If the EPA cannot meet its burden the Court must enjoin, *Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir, 2005) at 1031 ("The district court relied on established law authorizing agency actions to continue during the section 7(a)(2) consultation process **only** if the actions are non-jeopardizing to the protected species and will not result in a

---

[80] See Zygmunt J.B. Plater, *Statutory Violations and Equitable Discretion*, 70 CAL. L. REV. 524, 527 (1982) (arguing that when a court is confronted with any clear statutory violation, a court has no discretion or authority to balance the equities so as to permit that violation to continue); Oliver A. Houck, *The 'Institutionalization of Caution' Under § 7 of the Endangered Species Act: What Do You Do When You Don't Know?*, 12 ENVTL. L. REP. 15,001, 15,010 (1982) ("It is not a matter of balancing the equities; the Congress has already struck the balance in favor of endangered species."); see also *California Least Tern*, 816 F.2d at 1383 ("We may not use equity's scale to strike a different balance [between endangered species and federal projects].")

[81] *Washington Toxics Coalition* at 1035 ("We have held that the appropriate remedy for violations of the ESA consultation requirements is an injunction pending compliance with the ESA. *See Peterson*, 753 F.2d at 764. We have also allowed non-jeopardizing agency actions to continue during the consultation process. *See, e.g., Sierra Club v. Marsh*, 816 F.2d at 1376. We have not expressly stated who bears the burden of showing that the action is non-jeopardizing, but the burden should be on the agency, the entity that has violated its statutory duty.... The district court correctly assigned EPA the burden of proving that its actions were non-jeopardizing.")

substantive violation of the ESA. *See id.; Thomas v. Peterson,* <u>753 F.2d 754</u>, 764-65 (9th Cir.1985). The district court held that EPA did not meet its burden of showing that the 54 registrations were non-jeopardizing."), *Id.*, at 1034 ("The purpose of the consultation process, however, is to prevent later substantive violations of the ESA. *Sierra Club v. Marsh,* 816 F.2d at 1389. The remedy for a substantial procedural violation of the ESA - a violation that is not technical or de minimis - **must therefore be an injunction** of the project pending compliance with the ESA. *Id.; Peterson,* 753 F.2d at 764. **It is well-settled that a court can enjoin agency action pending completion of section 7(a)(2) requirements**. *See Sierra Club v. Marsh,* 816 F.2d at 1389; *Peterson,* 753 F.2d at 765 (emphasis added).").

Clearly in view of its 11/20/20 BE stating that glyphosate does likely adversely affect lists species and critical habitat, EPA does not **now** possess the substantial evidence necessary to conclude glyphosate will **not** cause unreasonable adverse listed species affects. Yet EPA's self evident denial of possible adverse affect is implicit by EPA allowing the continuing usage of glyphosate under its interim rule, during § 7 consultation. EPA's arrogant disregard for listed species is transparent, see *Nat'l Family Farm Coal. v. U.S. EPA*, 966 F.3d 893, 917 (9th Cir. 2020) (holding EPA's registration of the glyphosate-based pesticide Enlist Duo lacked substantial evidence because of failure to "consider[] how the destruction of milkweed on target fields would affect monarch butterflies.").

Thus, unless EPA can affirmatively **immediately** demonstrate continued usage of glyphosate under its interim rule will **not** cause unreasonable adverse listed species affects, this Court must enjoin under § 1536 (d).

Just like continued timber sales jeopardize listed specie habitat during § 7 consultation, the evidence profoundly shows and EPA admits same in its 11/20/20 BE, continued glyphosate spraying will jeopardize listed species, *Lane County Audubon Soc. v. Jamison* 958 F.2d 290 (9th Cir, 1992) at 294 ("In order to maintain the status quo, section 7(d) forbids "irreversible or irretrievable commitment of resources" during the consultation period. *Id.* § 1536(d)."); *Pac. Rivers Council v. Thomas,* 936 F.Supp. 738, 745 (D.Idaho 1996). See *TVA v. Hill,* 437 U.S. at 169 (quoting *Hill v. TVA,* 549 F.2d 1064, 1070 (6th Cir.1977)) "Our responsibility under [the ESA] is to preserve the status quo where endangered species are threatened, thereby guaranteeing the legislative or executive branches sufficient opportunity to grapple with the alternatives."); *Pacific Rivers Council et al. v. Thomas,* Civ. No. 92-1322, at 13 (D.Ore. October 20, 1996) (disagreeing with the federal defendant's assertion that ongoing grazing constituted the status quo).").

In sum, there's no difference between timber sales and registered herbicides "per se" jeopardizing listed species during § 7 consultation, *Scott Timber Co. v. U.S.*, 692 F.3d 1365 (Fed Cir, 2012) at 1375 FN 4 ("In *Precision Pine,* we noted: "While such consultations are taking place, § 7(d) of the [Endangered Species Act] prohibited the Forest Service from making any `irreversible or irretrievable commitment of resources' during the consultation process. 16 U.S.C. § 1536(d)." *Precision Pine,* 596 F.3d at 821. "The Ninth Circuit further explained that pursuant to its decision in *Lane County Audubon Society v. Jamison,* 958 F.2d 290 (9th Cir. 1992), timber sales were `per se irreversible and irretrievable commitments of resources under section 7(d) [of the ESA],

and thus could not go forward during this consultation period.'" *Id.* at 822 (quoting *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir.1994)).")

Thus, preserving the "status quo" for purpose of 7 (d) is preserving the listed species of Roan Mountain, which EPA must do during it consultation, *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989), which species until FBEMC's first spraying in 2017 had a vibrant unmolested pure environment to thrive for eons, *Tenn. Valley* at 184 ("ESA was originally drafted in **absolute terms, providing no exceptions for the protection of qualified species** (emphasis added).)"

## 28 U.S.C. § 2401(a) DOES NOT BAR PLAINTIFF'S § 7 CLAIMS

> [T]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, ***whatever the cost.***

Tenn. Valley Auth., 437 U.S. at 180, 184 (Emphasis Added)

Plaintiff offers an injunctive relief request that does not require the Court to cancel or withdraw EPA's registration and the statute of limitations to the extent there is one would not start at the registration.

28 U.S.C. § 2401(a) (1994) reads in pertinent part "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the **right of action first accrues**. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases (emphasis added)."[82]

District Court in *226* applied the 6 year limit under 28 U.S.C. § 2401(a) finding Plaintiff's suit was jurisdictionally barred (Doc 53, p 8, 18), because Plaintiff had to bring

---

[82] Section 2401(a) has been applied in actions for judicial review brought pursuant to the APA, which govern review under ESA, yet the C.F.R. appears silent on Section 2401(a).

suit within 6 years of Glyphosate's original 1974 registration or by 1980, four decades before the injury occurred.

The Endangered Species Act[83] as originally enacted 9/28/73 (16 U.S.C. 1531 et seq.) had **no** statute of limitations baring § 7 claims. It was amended 1978, 1982, reauthorized and amended on October 7, 1988, under Public Law 100-478, further amended 1988, 2004, 2005,[84] and today still **has no statute of limitations** baring § 7 claims, *Center for Biological Diversity v. EPA*, No. 14-16977, p 21 (9th Cir. 2017) (" Neither FIFRA nor the ESA provides a limitations period when a Section 7 citizen suit filed in a district court challenges the EPA's decision to register or reregister a pesticide active ingredient or pesticide product."). The reason for no statute of limitations is obvious, because "*there is no time dimension of the risk,*"[85] when we are talking about listed species and particularly extinction risk.

Because the original enactment, re-enactments and amendments to ESA contain no § 7 enforcement statute of limitations it must be given deference, *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 975 (9th Cir. 2003)) ("[I]t is our duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section." *Bennett v. Spear*, 520 U.S. 154, 173, 117 S. Ct.

---

[83] ESA replaced the Endangered Species Conservation Act of 1969, https://uscode.house.gov/statutes/pl/91/135.pdf

[84] See https://ballotpedia.org/History_of_the_Endangered_Species_Act; https://scholarship.law.missouri.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1177&context=jesl

[85] See *Precaution in the American Endangered Species Act as a Precursor to Environmental Decline: The Case of the Northwest Forest Plan* https://www.researchgate.net/publication/268036824_Precaution_in_the_American_Endangered_Species_Act_as_a_Precursor_to_Environmental_Decline_The_Case_of_the_Northwest_Forest_Plan ("The ESA takes a strong but narrowly defined precautionary approach in the face of uncertainty about risk to species...The ESA and its application **do not commonly recognize the time dimension of risk** (emphasis added).")

1154, 137 L. Ed. 2d 281 (1997) (internal quotations omitted). It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. *Davis v. Michigan Dep't. of Treasury*, 489 U.S. 803, 809, 109 S. Ct. 1500, 103 L. Ed. 2d 891 (1989).")

It further appears the reenactments/amendments of ESA occurred after 28 U.S.C. § 2401(a) enactment, and/or that there have been no substantive amendments regarding a 6 year limit in any later 2401(a) amendments. Nor does it not appear 2401(a) in any enactment expressly repeals ESA § 7. Plaintiff submits, unless there was a subsequent amendment in 2401(a) expressly repealing or modifying ESA § 7, it does not apply, *Tenn. Valley* at 185.

Further, judicial construction normally accords the last statute standing controlling, particularly with *Tenn. Valley* at 180, 184 no exceptions language.

As noted above, In *Tennessee Valley* at 189-190 the Supreme Court wrestled with whether or not subsequent legislation in conflict with ESA undermined its § 7 legislative intent, It held it did not, that ESA was superior, because the intention of the legislature to repeal "must be clear and manifest" where there was a "positive repugnancy" between the old and the new laws, *Id*.

§ 2401(a) provides no intent to repeal § 7 and again ESA is the last man standing legislatively speaking. Thus, to apply § 2401(a) as a jurisdictional bar of Plaintiff's § 7 claims, is to foreclose ESA's legislative intent of protecting listed species and critical habitat at ***all costs***.

Further, at a minimum Plaintiff is entitled the discovery rule where "a cause of action accrues when the injured party discovers - or in the exercise of due diligence

should have discovered - that it has been injured." *Nat'l Treasury Emps. Union v. FLRA,* 392 F.3d 498, 501 (D.C.Cir. 2004). This would at a minimum at least entitle him to the dates of the triggering acts,

If we accept an interpretation where the original registration date 1974 is somehow controlling it leaves Plaintiff in the absurd situation where his claim could never be asserted, because the limitations period would have expired long before it became ripe.

## PLAINTIFF HAS STANDING

To establish standing Plaintiff must show:

> [He] has suffered an injury in fact that is (a) concrete and particularized
> and (b) actual or imminent, not conjectural or hypothetical; (2) the injury
> is fairly traceable to the challenged action of the defendant; and (3) it is
> likely, as opposed to merely speculative, that the injury will be redressed
> by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Services,* 528 U.S. 167, 180-81, (2000),* also *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

As evident in the *Allegations* below and *226*, Plaintiff's relationship with precious listed species is not incidental, but rather full time and year round. It is enduring, deeply intimidate, personal, physical, scientific, emotional and spiritual, 7/25/19 TRO Hearing. Plaintiff does not have regular human friends he meets or visits. His human contact is rather infrequent. Plaintiff's best friends are his cat, the precious species here, including listed species (which are at the top of his list), nature, the Mountain and its animals and plants, who he has learned to communicate with, (see *Allegations*).

Plaintiff organized the weaning years of his life so he could be away from the pollutants, stressors of city life and low frequency banal human contact; to enjoy

fresh/pure air, pristine/pure waters and fertile/uncontaminated soils; to commune/live/mediate/ pray with, enjoy and study the glory of nature and the protected species of this mountain with whom he so deeply loves. In other words, the habitat these protected species occupy/reside is the very same habitat Plaintiff resides and lives in, (see Allegations).

But, that was all suddenly all stolen from him when FBEMC sprayed. The sudden and mortal injury and disappearance of these precious listed species deeply wounded Plaintiff. The pure and undefiled nature he once enjoyed with them (e.g. living together in their same habitats) was lost he had to share their same contaminated air, water, soil and vegetation. He lost his best friends, dance partners, fellow artists/creators, mentors and advisors. Plaintiff lost the subjects of his scientific study, chronicling, photography, observation and enjoyment; he lost his recreational hiking amongst them; he has lost the pollinators of his flowers, plants, orchard and garden; he lost the pure uncontaminated soil which both these precious species and Plaintiff depend upon; he lost the pollinators of his garden, orchard, plants and flowers; he lost his efforts to protect their habitats and to conserve them; he also sadly lost a deep holy spiritual and intimate emotional, personal and spiritual connection to these precious creatures and to this remarkable mountain. **This made Plaintiff literally cry!** (See Allegations).

As evident in the Allegations below and *226* Plaintiff's injuries are particularized, all **directly** related to, caused by, tied to FBEMC's use of EPA's defective herbicide registrations to spray Roan (Doc 29, p 54-89, p 72-73 ¶ 55, p 73 ¶ 58, p 73 ¶ 59, 74 ¶ 61; 7/25/19 TRO presentation; Doc 28, p 3; Doc 1, p 7, p 11 [FN 15], p 15, 17, 22, 27 ["FBEMC by spraying on its alleged easements will harm/kill endangered species, which

exist on said easements"]; Doc 1, p 28, p 34 [¶ 12], p 41, 43, 45-46, p 60-72, p 105 - 159, p 147, 148, 153, 179, 181, p 234). Plaintiff's injury and the injury to listed species all flowed to FBEMC's glyphosate spraying of Roan and its overwhelming impact. It did not result from the glyphosate spraying of the agricultural or residential use of glyphosate, which long preexisted FBEMC's spraying. That activity had been ongoing for many years prior to FBEMC's monumental spraying absent such negative affect.(see *Allegations*)

The **only condition** that so severely and adversely changed on the mountain, which so abruptly and massively harmed protected species/critical habitat (and Plaintiff) to such a sudden and **huge** degree, was the **shock** of FBEMC's mountain **wide and overwhelming** spraying program, (Doc 29, p 67, 70).[86] Plaintiff's injuries were non-existent beforehand and **only** occurred suddenly and in great force **immediately** <u>after</u> FBEMC's spraying.[87] As provided above and in the Allegations FBEMC's total estimated spray area was 880 football fields worth of concentrated herbicide (assuming a full spray of their easements surrounding Roan), being levels at orders of magnitude greater that that employed in agricultural or residential applications. And, it was applied over a short period over a about a month or so. (see *Allegations*)

It was unquestionably FBEMC employing an old defective registered herbicide, introducing the mountain it an incredible toxic load that **directly** harmed and eviscerated

---

[86] Doc 1, p 177 ("Orr conducted research on the mountain in his natural setting for years prior to FBEMC's spraying. Roan Mt at the time was a pure undefiled virgin. It had never seen the massive introduction of herbicides, like it did in 2017. This provided Orr the unique opportunity to observe/document the "before and after" conditions/changes that occurred to protected specie habitats.")

[87] FN 29, *supra*; Doc 1, p 147 , 148, 151, 153, 179; This was visually presented in the 7/25/19 TRO Hearing.

Plaintiff preservation and conservation efforts (Doc 1, p 39 ¶ 36, Doc 29, p 23, 79).(See *Allegations*).

Plaintiff's requested injunctive relief would create a condition for a renewal of the Roan's habitats and a return of her missing listed species,[88] and hence a return of Plaintiffs activity and enjoyment with them.[89] This opportunity will be stolen injuring Plaintiff even further if FBEMC is allowed to spray yet again. Any future spraying by FBEMC will foreclose the badly needed opportunity for these listed specie habitats to heal, injuring listed species further along with Plaintiff. (See *Allegations*.)

Despite Plaintiff's concrete particularized injury-in-fact, under *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 183 (2000), Plaintiff meets requisite environmental standing requirements, which have been liberalized, where the injury-in-fact requirement is shifted to a more open examination of the plaintiffs relationship with the environment.

Furthermore, Plaintiff's *Allegations* below of EPA's failure to conduct § 7 Consultation further accords him procedural standing, *Natural Resources Defense Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014). Plaintiff need only show ESA consultation procedures "are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing," *Cantrell v. City Of Long Beach*, 241 F.3d 674,

---

[88] In the case of the Bombus affinis, one of Plaintiff's trial experts will testify if necessary the affinis will be reintroduced to Roan after the mountain has sufficiently detoxified.
[89] Doc 29, p 83-84, p 83 ¶ 100 ("Thus, once spraying totally ceases and the environment has time to sufficiently heal itself, we should eventually see a return of the affinis. I can then also restart my scientific studies, research, photography, organic gardening efforts, and importantly my enjoyment of the mountain's protected species in their natural undefiled habitat. I can then return to my deep meditations and my life as I intended it to be... I cannot tell you how much I want all this. The sooner the better.")

679 (9 Cir. 2001), and that compliance with those procedures "could protect [his] concrete interests," *Natural Resources Defense Council*, 749 F.3d at 783; *Defenders of Wildlife v. Flowers*, 414 F.3d 1066, 1069 (9th Cir. 2005).

Plaintiff has shown in his Notices and 7/25/19 TRO PPT Presentation abundant evidence of the true harm caused by EPA's failure to consult with FWL. Accordingly, Plaintiff's injury falls within the "zone of interests," which ESA's § 7 consultation was designed to protect, *Douglas County v. Babbitt*, 48 F.3d 1495, 1499 (9th Cir. 1995).[90]

Plaintiff establishes substantive standing both under ESA § 9 and ESA § 7. In the later case he need only establish procedural standing, which he has because "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n. 8, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)

After conducting ESA § 7 consultation, FBEMC will almost certainly not be able to engage in their highly destructive registered herbicide spraying in their current manner, if at all, benefiting Plaintiff, redressing his injury, but that is not required for Plaintiff's prudential standing, *Defenders of Wildlife*, 504 U.S. at 572 n. 7, *Cantrell v. City Of Long Beach*, 241 F.3d 674, 682 (9 Cir. 2001) ("[P]laintiffs asserting procedural standing need

---

[90] ESA § 7 consultation, which would benefit the Spruce fir moss spider would also importantly benefit all insects on the mountain, especially the Bombus affinis. There is equivalency between the spider and affinis in terms of herbicide spraying, critical habitat destruction and § 7 consultation. Benefiting one insect species automatically benefits other for the reasons set forth in Plaintiff's 4/30/18 Notice (Doc 1, p 175- 194). These insects also share the same critical habitat. If the critical habitat is protected by § 7 consultation, both the critical habitat and balance of the mountain where the affinis also resides is protected. The spraying, which is negatively impacting critical habitat is occurring well outside the critical habitat, below Plaintiff's residence. Thus, curtailing it there benefits the entire mountain, in view of hydrous drifting.

not demonstrate that the ultimate outcome following proper procedures will benefit them.")

      Plaintiff respectfully submits he has shown he has suffered a distinct and palpable injury to himself, an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; that his (2) injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision, thus establishing each of the required elements for standing, *Warth Warth v. Seldin,* 422 U.S. 490, 498 - 501.

## DEFENDANT LOVEN

      Defendant Jeff Loven has been properly served individually in Plaintiff's 3/12/21 Notice and like he was in *226*, individually, in his personal capacity, separate from FBEMC's corporate counsel. For the reasons set forth in Plaintiff's *226* pleadings and in the allegations below, Loven individually received, was timely noticed/served just as the government and FBEMC defendants. Plaintiff credibly alleges below and in *226* (Doc 29, p 22-31) Loven's ultra-vires acts with regard to FBEMC's spraying); he has conducted these acts personally, in his individual capacity (Doc 29, p 1, 15, 16, 25, 31); and thus liable as an Individual Defendant, pending discovery.

### ALLEGATIONS

      Plaintiff incorporates by reference his *Allegations* from his 7/19/19 Complaint (Doc 1, p 31 - 48) and his 12/4/19 Amended Complaint (Doc 29, p 22 - 52), as if set forth herein below.

      Plaintiff's further Allegations include:

1. On or shortly after 5/26/17, 4/30/18, 7/5/19, 3/12/21 Defendants and/or their principals (Secretaries, Administrators, Directors) received, were served Plaintiff's 1540(g)(2)(A)(i) Notices bearing the said dates disclosing irreparable damage to listed species and critical habitat due to glyphosate usage.

2. Plaintiff served 3/15/21 via Certified Mail return receipt requested his 3/12/21 Notice entitled *Comment and Continuing § 9 Take Notice and Intention to Sue ESA §1540(g)*, which contained as Attachments said 5/26/17, 4/30/18, 7/5/19 Notices, on Defendants and/or their principals (Secretaries, Administrators, Directors).

3. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) were informed, admit, knew or had reason to know of an illegal EPA and FBEMC § 9 Take of listed species on Roan Mountain by FBEMC's use of the registered herbicides glyphosate and Imazapyr, which killing listed species and would irreparably adversely affect their habitat, including critical habitat.    .

4. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or collectively) were informed, admit, knew or had reason to know that FBEMC's spraying of herbicides caused hazardous hydrous drift to be transported at distance into listed species habitat, including critical habitat, significantly and very negatively irreparably adversely affecting said habitat and listed species.

5. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or

collectively) were informed, admit, knew or had reason to know said hydrous drift was transported in humidity, the rain, by wind and other ambient factors for long distances originating from original spray sites for a period of many months after original spraying and would irreparably injure/kill listed species, adversely affect their habitats, including critical habitat.

6. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or collectively) were informed, admit, knew or had reason to know said transported hydrous drift contained glyphosate, Amine Methyl Phosphonic Acid (AMAP) and Formaldehyde, as well as likely herbicide co-ingredients/co-herbicides (collectively "Drift Products"), which would irreparably injure/kill listed species, adversely affect their habitats, including critical habitat.

7. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or collectively) were informed, admit, knew or had reason to know said drift products contaminated air, water, deposited on plants and into the soil of listed specie habitat, including within critical habitat,[91] which would irreparably injure/kill listed species, adversely affect their habitats, including critical habitat.

---

[91] See Doc 1, p 121 FN 50 (The impact of glyphosate on soil health The evidence to date https://www.soilassociation.org/media/7202/glyphosate-and-soil-health-full-report.pdf ("[I]n soils where there had been no previous application of glyphosate, microbial respiration increased in response to glyphosate exposure. This potentially reflects a stress response of species sensitive to glyphosate. In contrast, in soils that have been chronically exposed to glyphosate, the microbes did not have this response. This is most likely due to the gradual elimination of glyphosate sensitive species...at least six [] studies found damaging effects of the herbicide. One study found that the earthworm Eisenia fetida avoids soil contaminated by the glyphosate based herbicide Groundclear, and this impact

8. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or collectively) were informed, admit, knew or had reason to know said drift product once ingested and/or inhaled by listed species would cause them to suffer among other things gut microbiome debilities, which would significantly impair their natural immunity exposing them to disease/impair their capacity to survive, resulting in their death and extinction.

9. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or collectively) were informed, admit, knew or had reason to know said drift product once ingested and/or inhaled by listed species would also adversely impair their

---

on locomotor activity could compromise the survival of the worms. In another study, the number of hatched Eisenia fetida Andrei cocoons was significantly reduced in earthworms exposed to Roundup treated soils, and the number of juveniles was also significantly lower, indicating that glyphosate has a deleterious effect on the viability of cocoons. This study too found that the earthworms also avoided the soil treated with the herbicide. Earthworms have chemoreceptors and sensory turbercles and present a high sensitivity to chemicals in the soil. Another laboratory study on Eisenia foetida earthworms demonstrated severe effects on the development and reproduction caused by glyphosate (active ingredient only) at a range of concentrations, indicating that it may have significant toxic effects on soil biota. There was a decrease in the mean weight of the earthworms, and no cocoons or juveniles were found in the soil containing the herbicide. In a different earthworm greenhouse experiment, Roundup application initially stimulated surface casting activity of Lumbricus terrestris L. However the number of produced casts ceased dramatically about one week after herbicide application; cumulative cast mass produced by L. terrestris four weeks after herbicide application was reduced by 46% compared to the area not treated by herbicides. The activity of soil dwelling earthworms, Aporrectodea caliginosa, was not affected. The reproduction success of both earthworm species substantially decreased after herbicide application. The hatching rate of cocoons decreased from 43% to 17% for L. terrestris and from 71% to 32% for A. caliginosa when cocoons were collected from soil without herbicide or with herbicide treatment, respectively... A recent 2016 study found that in the long term (132 days), the continuous consumption of leaf litter contaminated with glyphosate (Cheminova) decreased the earthworms (Pontoscolex corethrurus) growth rate, with a clear decline in their total biomass.")

reproduction and survival capabilities, particularly soil dependent species such as listed plant species, *Bombus affinis* and *Spruce-fir moss spider*, resulting in their death and extinction and otherwise would irreparably adversely affect their habitats, including critical habitat.

10. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or collectively) were informed, admit, knew or had reason to know said drift product once deposited into the soil would cause highly toxic Formaldehyde generation/emission, which would significantly adversely affect listed species, particularly those soil dependent, such as listed plant species and the Bombus affinis, resulting in their death and extinction.

11. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or collectively) were informed, admit, knew or had reason to know said drift product after FBEMC's first spraying in 2017 resulted in the total disappearance of the Bombus affinis from her nature habitats, inevitably due to their death, which Plaintiff had previously observed her prolific presence.

12. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or collectively) were informed, admit, knew or had reason to know said drift product was being deposited into the listed Spruce-fir moss spider's critical habitat and was significantly adversely modifying it, which will likely result in their death and extinction.

13. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of said Plaintiff 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or collectively) were informed, admit, knew or had reason to know that listed species residing within FBEMC's sprayed ROW easement would be taken and die and irreparably adversely affect their habitats.

14. Despite receipt and knowledge of Plaintiff's said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices, individually or collectively (concurrently submitted to EPA as Comments during it glyphosate registration rule making) disclosing extreme hazardous toxic hydrous drift and its highly adverse affect upon listed species and critical habitat, EPA failed to consider said hydrous drift in its rule making.

**EPA's Failure To Consider The Best Available Science, Hydrous Drift and Permitting Glyphosates Spraying To Kill Listed Species On Roan Constitutes An Illegal § 9 Take**

15. Defendant EPA despite being informed, admitting, knowing or having reason to know of the extreme hazard posed listed species due to hydrous drift, having received and being in possession of Plaintiff's said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices, non-the-less promulgated its 1/22/20 interim glyphosate registration ignoring said hazard, ignoring Plaintiff's said Notice/Comments containing each of the following corroborating publications in so doing:

(a) *Atmospheric deposition of current-use and historic-use pesticides in snow at national parks in the western United States (May 2006),* https://www.ncbi.nlm.nih.gov/pubmed/16749678 (**"Pesticide deposition in the <u>Alaskan parks</u> is attributed to long-range**

**transport because there are no significant regional pesticide sources** (emphasis added).");

(b) *Pesticides Found in Amphibians from Remote Areas in California (March 2013),* https://toxics.usgs.gov/highlights/frogs_pesticides.html https://ca.water.usgs.gov/projects/PFRG/DOI_10.1002_etc.2308_frogs_pesticides.pdf ("[S]cientists looked at pesticides in Pacific Chorus frogs (Pseudacris regilla) and their habitat (water and sediment) in seven remote, high-elevation locations in California (including Giant Sequoia National Monument, Yosemite National Park, and Lassen Volcanic National Park... USGS scientists have been investigating their decline for over a decade. Fungicides (pesticides used to control fungal diseases) were found in adult male frogs from all sites... **Data generated from this study indicate that amphibians residing in these *remote locations* are exposed to and capable of taking up current-use pesticides** (emphasis added).");

(c) *Getting the Drift on Chemical Trespass* http://www.beyondpesticides.org/assets/media/documents/infoservices/pesticidesandyou/Summer%202004/Getting%20the%20Drift%20on%20Chemical%20Trespass.pdf ("Pesticides drift for miles - A 2001 study by Texas A&M University researchers shows that **pesticides can ... be transported over long distances fairly rapidly through wind and rain**. A U.S. Geological Survey report reached similar conclusions, finding, "After they are applied, many **pesticides volatilize into the**

**lower atmosphere, a process that can continue for days, weeks, or months after the application,** depending on the compound.");

(d) *Occurrence and fate of the herbicide glyphosate and its degradate aminomethylphosphonic acid in the atmosphere (June 2010)*, https://foodfreedom.files.wordpress.com/2011/08/chang_2011_glypho sate-in-air.pdf ("The frequency of glyphosate detection ranged from 60 to 100% in both **air** and **rain**. The concentrations of glyphosate ranged from <0.01 to 9.1 ng/m(3) and from <0.1 to 2.5 µg/L in **air** and **rain** samples, respectively. The frequency of detection and median and maximum concentrations of glyphosate in air were similar or greater to those of the other high-use herbicides observed in the Mississippi River basin, whereas its concentration in rain was greater than the other herbicides. ")

(e) *Pesticides in the atmosphere of the Mississippi River Valley, Part I — Rain* (April 2000), https://www.ncbi.nlm.nih.gov/pubmed/10805240 ("Herbicides accounted for the majority of the wet depositional loading at the Iowa and Minnesota sites, but methyl parathion (1740 microg/m2) was the dominant compound contributing to the total loading at the agricultural site in Mississippi. Atrazine, CIAT (a transformation product of atrazine and propazine) and dacthal were detected most frequently (76, 53, and 53%, respectively) at the background site **indicating their propensity for long-range atmospheric transport.**")

(f) *Pesticides in Mississippi air and rain: A comparison between 1995 and 2007* (June 2014)

https://www.researchgate.net/publication/260252493_Pesticides_in_M ississippi_air_and_rain_A_comparison_between_1995_and_2007

("Seven compounds in 1995 and five in 2007 were detected in ≥50% of both air and rain samples. Atrazine, metolachlor, and propanil were detected in ≥50% of the air and rain samples in both years. **Glyphosate and its degradation product, AMPA, were detected in ≥75% of air and rain samples in 2007** ... The 1995 seasonal wet depositional flux was dominated by methyl parathion (88%) and was >4.5 times the 2007 flux. Total herbicide flux in 2007 was slightly greater than in 1995, and was dominated by glyphosate. Malathion, methyl parathion, and degradation products made up most of the 2007 non-herbicide flux.")

(g) *Occurrence And Fate Of The Herbicide Glyphosate And Its Degradate Aminomethylphosphonic Acid In The Atmosphere (June 2010)*, https://foodfreedom.files.wordpress.com/2011/08/chang_2011_glypho sate-in-air.pdf ("This is the first report on the ambient levels of glyphosate, the most widely used herbicide in the United States, and its major degradation product, aminomethylphosphonic acid (AMPA), in air and rain... The frequency of glyphosate detection ranged from 60 to 100% in both air and rain. **The concentrations of glyphosate ... in rain was greater than the other herbicides** (emphasis added).");

(h) *Glyphosate and Its Degradation Product AMPA Occur Frequently and Widely in U.S. Soils, Surface Water, Groundwater, and Precipitation (April 2014)*, https://www.researchgate.net/publication/261329879_Glyphosate_and _Its_Degradation_Product_AMPA_Occur_Frequently_and_Widely_in _US_Soils_Surface_Water_Groundwater_and_Precipitation (**Found glyphosate and AMPA in 70% of precipitation, Figure 3, "Glyphosate and AMPA were detected frequently in ... precipitation"**);

(i) *Environmental Impact of Glyphosate use in Argentina*, http://www.ensser.org/fileadmin/user_upload/Mex16.MARINO- _Mexico_dic2016-.pdf (Discloses at p 23, 9 sampling sites, 2 campaigns and 112 rainfall samples, with concentrations in rain ($\mu$g/L): GLY - Average DE 4.5 $\pm$ 10.4, and AMPA - Average DE <LC $\pm$ 1.2).;

(j) *Neonicotinoid Insecticides Documented in Midwestern U.S. Streams (July 2014)*, https://toxics.usgs.gov/highlights/2014-07-21- neonics.html ("Pulses of elevated neonicotinoid insecticide concentrations were associated with **rainfall events** during and shortly after crop planting, which is consistent with the spring flushing of herbicides that has been documented in Midwestern U.S. streams. **The insecticides also were detected prior to their first use** during the

growing season, **persisting from use during previous growing seasons.**");

(k) *Common Weed Killer is Widespread in the Environment (April 2014),* https://toxics.usgs.gov/highlights/2014-04-23-glyphosate_2014.html **([G]lyphosate and its degradation product AMPA are widely transported long distances off-site from agricultural and urban sources**, summarizing results of 3,732 environmental samples collected between 2001 and 2010 from 38 states.);

(l) Figure Showing Ubiquitous Presence of Glyphosate and AMPA in the Environment, from *Common Weed Killer is Widespread in the Environment, Id.,* https://toxics.usgs.gov/photo_gallery/photos/pesticides/RPE/glyphosat e_det_freq_plot_l.png

(m)*Glyphosate and Its Degradation Product AMPA Occur Frequently and Widely in U.S. Soils, Surface Water, Groundwater, and Precipitation* https://onlinelibrary.wiley.com/doi/abs/10.1111/jawr.12159 ("**[G]lyphosate and AMPA are usually detected together**, mobile, and occur widely in the environment. Glyphosate was detected without AMPA in only 2.3% of samples, whereas AMPA was detected without glyphosate in 17.9% of samples. **Glyphosate and AMPA were detected frequently in soils and sediment, ditches and drains, precipitation, rivers, and streams.**");

(n) *U.S. Geological Survey Finds Surprising Results About Glyphosate* (Sept 2011), http://www.farmfutures.com/story-us-geological-survey-finds-surprising-results-about-glyphosate-8-53017 ("USGS Chemist Paul Capel says the weed killer ... was also detected in the air. **'It was generally thought not to enter the atmosphere ....So its presence in the air was surprising** and then its continual constant presence in the streams was also somewhat surprising from what we first expected.'");

(o) *Study Finds 'Pesticide Rain' Affecting Even Remote Areas, 1991 (July 1991),* http://articles.latimes.com/1991-07-11/news/mn-2882_1_remote-areas ("**Now, according to a federal study... the newest environmental concern could be 'pesticide rain.' In the broadest study of its kind, the U.S. Geological Survey tested rainwater from 23 states during the height of the growing season last year and found detectable...** levels of weedkillers in water from throughout the region.... **traces of herbicide-laced rainwater were also found in remote, presumably pristine locales such as Michigan's Isle Royale National Park in Lake Superior and northern Maine, confirming suspicions that farm chemicals migrate through the atmosphere over long distances. 'We know there is transport over some relatively long distance, let's say on the order of 10 to maybe 100 miles,'** Donald Goolsby, a Geological Survey hydrologist and lead researcher on the project, said... **The gases then are carried away in wind and clouds, only to return to**

**earth later during storms**... 'It's real important for people to understand that the use of pesticides in one area is not necessarily a problem in that one area, but it could be much broader, and [due to atmospheric transport] communities may well need to be concerned, Curtis said.");

(p) *How Dangerous Is Pesticide Drift?* (Sept 2012), https://www.scientificamerican.com/article/pesticide-drift/ ("PAN cites research showing that upwards of **95 percent of applied pesticides miss their target**, reaching nearby people and wildlife, waterways, soil and air instead... PAN also warns of so-called "volatilization drift"—whereby **pesticides evaporate into the air from off of crops or out of the soil for up to several days following an application.**");

(q) *What You Need To Know About Chemical Drift*; http://www.wtv-zone.com/infchoice/drift.html ("**Approximately 2.5 million tons of pesticides are applied to crops every year, but less than 0.1% actually reach the target pests. The excess pesticide spreads into the environment where it can detrimentally affect human health through the contamination of soil, water, and the atmosphere**");

(r) *Amounts of pesticides reaching target pests: Environmental impacts and ethics (2009)* https://link.springer.com/article/10.1007%2FBF02286399;

(s) *Diazinon and Chlorpyrifos Loads in Precipitation and Urban and Agricultural Storm Runoff during January and February 2001 in the San Joaquin River Basin, California.*" U.S. Geological Survey (2003), https://pubs.usgs.gov/wri/wri034091/wrir034091.pdf.

16. Defendant EPA admits, knew or had reason to know Plaintiff's said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (individually or collectively) and each of the above publications contained in said Notices demonstrated glyphosate's use operated to illegally Take listed species on Roan Mountain in violation of ESA § 9 and otherwise irreparably injure/kill listed species, adversely affect their habitats, including critical habitat.

17. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of Plaintiff's said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) admit or knew or had reason to know that the usage of registered glyphosate herbicides used by FBEMC on or near Roan Mountain resulted in an illegal § 9 takes of her listed species, either as a result of spraying said species existent within ROW's or from hydrous or other drift migrating into their habitats, which would irreparably injure/kill listed species, adversely affect their habitats, including critical habitat.

18. .Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of Plaintiff's said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) were informed, admit, knew or had reason to know that usage of registered glyphosate herbicides as used by FBEMC on or near Roan Mountain resulted in an illegal § 9 take of the Bombus affinis either from

spraying said species existent in FBEMC's ROW's or from hydrous or other drift migrating into their habitats.

19. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of Plaintiff's said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) were informed, admit, knew or had reason to know that usage of registered glyphosate herbicides as used by FBEMC on or near Roan Mountain resulted in an illegal § 9 take of the Spruce-fir moss spider either from spraying said species existent in FBEMC's ROW's or from hydrous or other drift migrating into their habitats, including critical habitat.

20. Defendants and/or their principals (Secretaries, Administrators, Directors) after receipt of Plaintiff's said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) were informed, admit, knew or had reason to know the usage of registered glyphosate herbicides used by FBEMC on or near Roan Mountain results in an illegal § 9 take of listed species by directly spraying them within ROW's or by significant irreparable adverse habitat modification, disappearance of listed species from their habitat, their death and/or extinction due to drift, including hydrous drift.

21. Defendant EPA after receipt of Plaintiff's said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) was informed, admits, knew or had reason to know glyphosate herbicides as used by FBEMC on or near Roan Mountain resulted in an illegal § 9 takes of her listed species by either spraying them within ROW's or by significant adverse habitat modification, disappearance

of listed species from their habitat, their death and/or extinction, due to drift, including hydrous drift.

22. Defendant EPA after receipt of said Plaintiff's 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) was informed, admits, knew or had reason to know glyphosate herbicides used by FBEMC on or near Roan Mountain results in an illegal § 9 take of her listed species, by either irreparable significant adverse habitat modification, disappearance of listed species from their habitat, their death and/or extinction, particularly now in view of EPA's 11/20/20 BE admission of such likely adverse affect of listed species.

23. Defendant EPA after receipt of Plaintiff's said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) was informed, admits, knew or had reason to know the same registered glyphosate herbicides, which will be used by FBEMC on or near Roan Mountain in the future will result in an illegal § 9 take of her listed species, particularly in view of EPA's 11/20/20 BE admission of such likely adverse affect of listed species.

24. Defendant EPA after receipt of said Plaintiff's 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) was informed, admits, knew or had reason to know its registered glyphosate and Imazapyr herbicides as used by FBEMC on or near Roan Mountain results in an illegal § 9 takes of her listed species, by either irreparable significant adverse habitat modification, disappearance of listed species from their habitat, their death and/or extinction.

25. Yet knowing this (that listed species are being illegally taken, injured and killed) Defendant EPA persists in maintaining its registrations for glyphosate and Imazapyr.

26. Defendant FBEMC after receipt of said Plaintiff's 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) was informed, admits, knew or had reason to know its use of registered glyphosate and Imazapyr herbicides on or near Roan Mountain results in an illegal § 9 take of her listed species, by either directly spraying them within ROW's or significant adverse habitat modification, disappearance of listed species from their habitat, their death and/or extinction, due to drift, including hydrous drift.

27. Individual Defendant Jeff Loven after receipt of said Plaintiff's 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either individually or collectively) was informed, admits, knew or had reason to know FBEMC's use of registered glyphosate and Imazapyr herbicides on or near Roan Mountain results in an illegal § 9 take of her listed species, by either directly spraying them within ROW's or significant adverse habitat modification, disappearance of listed species from their habitat, their death and/or extinction, due to drift, including hydrous drift.

28. Defendant FBEMC and Jeff Loven knew or had reason to know their acts would result and future acts of spraying their herbicides on Roan will result in significant irreparable adverse habitat modification, disappearance of listed species from their habitat, their death and/or extinction, either resulting from directly spraying them within ROW easements or due to drift, including hydrous drift migrating into their habitats, including critical habitat.

29. Yet knowing this (that listed species are being illegally taken, injured and killed) Defendants FBEMC and Jeff Love persist in spraying registered glyphosate and Imazapyr on or near Roan Mountain.

30. Yet knowing this (that listed species are being illegally taken, injured and killed) Defendants FBEMC and Jeff Love intend to spray registered glyphosate and Imazapyr on or near Roan Mountain, imminently, knowing it will result in significant irreparable adverse habitat modification, disappearance of listed species from their habitat, their death and/or extinction due to drift, including hydrous drift.

31. Yet knowing this Defendants FBEMC and Individual Defendant Jeff Loven will direct FBEMC to continue said spraying of Roan Mountain periodically "ad infinitum" in the future as part of FBEMC's ROW vegetative management program as long EPA registrations for glyphosate and Imazapyr are available.

32. From the beginning of electrical service on Roan Mountain FBEMC's ROW easements were efficiently maintained of vegetative growth via mechanical means until about May of 2017 when Defendant FBEMC began a new herbicide spraying program employing glyphosate and Imazapyr.

33. There is nothing prohibiting Defendant's FBEMC and Jeff Loven from returning to FBEMC's prior decade's long practice of mechanical clearing ROW easements, which was used from the inception of electrical service on Roan.

## § 7 CONSULTATION

34. The following actions undertaken by EPA triggered § 7 consultation, because they each were discretionary affirmative acts that inured to the benefit of listed species (see the reasons set forth in *Cause of Action*):

- Approving and Publishing 1974 EPA *Registration of Glyphosate*, https://www.epa.gov/ingredients-used-pesticide-products/glyphosate, (also cited by the District Court, Doc 53, p 9);

- Approving and publishing September 1993 EPA *Reregistration Eligibility Decision (RED) for glyphosate herbicides*, https://archive.epa.gov/pesticides/reregistration/web/pdf/0178fact.pdf;

- Conducting, publishing and taking Public Comments on its 9/8/15 *Registration Review - Preliminary Ecological Risk Assessment for Glyphosate and Its Salts*. US EPA (2015) Registration Review ("9/8/15 *Registration Review* "), https://downloads.regulations.gov/EPA-HQ-OPP-2009-0361-0077/content.pdf, posted Feb 28, 2018, https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0077;

- Conducting and publishing 4/28/16 *Registration Review--Preliminary Ecological Risk Assessment for Glyphosate and Its Salts* (PC Codes: 417300, 103601, 103604, 103607, 103608, 103613, 103603, 103605, 128501; DP Barcode: 417701), posted Apr 28, 2016, https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0056;

- Preparing, Communicating, *Meeting December 13-16, 2016 and Then Transmitting Meeting Minutes and Final Report RE: Considering and*

*Review of Scientific Issues Associated with EPA's Evaluation of the Carcinogenic Potential of Glyphosate To Acting Director Office of Pesticides 3/16/2017*, https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf;

- Conducting and publishing *December 2017 the Draft Glyphosate Human Health And Ecological Risk Assessments for Public Comment* (cited by the District Court, Doc 53, p 9);

- Conducting, publishing and taking Public Comments on its 2/27/18 *Draft Human Health and Ecological Risk Assessments for Glyphosate,* https://www.epa.gov/ingredients-used-pesticide-products/draft-human-health-and-ecological-risk-assessments-glyphosate; https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0066;

- Conducting, publishing and taking Public Comments on its *Registration Review - Preliminary Ecological Risk Assessment for Glyphosate and its Salts,* Posted Feb 28, 2018, https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0077 ;

- Conducting and publishing EPA's 11/21/18 *Response to Public Comments on the Preliminary Ecological Risk Assessment for Glyphosate*, https://www.epa.gov/sites/production/files/2019-04/documents/glyphosate-signed-efed-rtc.pdf;

- "In April 2019, after reviewing the public comments on the risk assessments, EPA released its Glyphosate Proposed Interim Decision for public comment, which closed on September 3, 2019

https://www.epa.gov/ingredients-used-pesticide-products/proposed-interim-registration-review-decision-and-responses-0," (also cited by the District Court, Doc 53, p 9);

- Conducting, making, publishing and seeking Comments of its May 6, 2019 *Glyphosate Proposed Interim Registration Review Decision* Case Number 0178,   https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-2344;

- Conducting and publishing EPA's issuance of its glyphosate interim-registration, posted 1/20/20, https://www.epa.gov/ingredients-used-pesticide-products/interim-registration-review-decision-and-responses-public;

- On January 22, 2020, EPA released its *Interim Registration Review Decision on Glyphosate.* See https://www.epa.gov/ingredients-used-pesticide-products/interim-registration-review-decision-and-responses-public, ("*Interim Registration Review Decision"*) (cited by the District Court, Doc 53, p 9);

- Conducting, publishing and taking Public Comments of EPA's *11/20/20 Draft National Level Listed Species Biological Evaluation (BE) for Glyphosate* ("*Biological Evaluation* "), https://www.epa.gov/endangered-species/draft-national-level-listed-species-biological-evaluation-glyphosate; draft biological opinion;

- Conducting, publishing and in certain cases taking Public Comments on **numerous** glyphosate studies/assessments wherein potential species risk

was disclosed, inferred or suggested, as set forth in

https://www.regulations.gov/docket/EPA-HQ-OPP-2009-0361/document

35. Defendant EPA admits, knew or had reason to know each of its above
    discretionary acts inured to the benefit of listed species, critical habitat and
    triggered EPA's § 7 duty to consult with USFWLS.

36. Government Defendants, EPA and/or their principals (Secretaries, Administrators,
    Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either
    individually or collectively) were informed and knew of EPA's § 7 duty to
    undertake consultation with USFWLS.

37. Government Defendants, EPA and/or their principals (Secretaries, Administrators,
    Directors) after receipt of said 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (either
    individually or collectively) were informed and knew of EPA's § 7 duty to
    undertake consultation with USFWLS owing to said Notices' disclosure of EPA's
    discretionary acts of:

    - Conducting, publishing, making and taking Public Comments on its 9/8/15
      *Registration Review - Preliminary Ecological Risk Assessment for
      Glyphosate and Its Salts*. US EPA (2015) Registration Review ("9/8/15
      *Registration Review* "), https://downloads.regulations.gov/EPA-HQ-
      OPP-2009-0361-0077/content.pdf, posted Feb 28, 2018,
      https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-0077;

    - Conducting, publishing, preparing, making and communicating, *Meeting
      December 13-16, 2016 and Then Transmitting Meeting Minutes and Final
      Report RE: Considering and Review of Scientific Issues Associated with*

*EPA's Evaluation of the Carcinogenic Potential of Glyphosate To Acting Director Office of Pesticides 3/16/2017*,

https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf

- Conducting, publishing, preparing, making, communicating and taking comments in its *Glyphosate Proposed Interim Registration Review Decision* Case Number 0178, Posted May 6, 2019, https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-2344;

- Conducting, publishing, preparing, making and communicating January 22, 2020, EPA's *Interim Registration Review Decision on Glyphosate*. See https://www.epa.gov/ingredients-used-pesticide-products/interim-registration-review-decision-and-responses-public, ("*Interim Registration Review Decision*");

- Conducting, publishing, preparing, making, communicating and taking Public Comments of EPA's *11/20/20 Draft National Level Listed Species Biological Evaluation (BE) for Glyphosate* ("*Biological Evaluation* "), https://www.epa.gov/endangered-species/draft-national-level-listed-species-biological-evaluation-glyphosate; draft biological opinion.

38. Defendant EPA was informed, admits, knew or had reason to know each of its above discretionary affirmative acts inured to the benefit of listed species, either directly or indirectly.

39. Defendant EPA was informed, admits, knew or had reason to know prior to the publication of its 9/8/15 *Registration Review* glyphosate negatively impacted gut

microbiome,[92] including exposed listed species, which would contribute to their injury and death.

40. Defendant EPA was informed, admits, knew or had reason to know prior to the publication of its 9/8/15 *Registration Review* that listed species typically have higher genomes, making them more sensitive to environmental stressors like glyphosate, particularly in view of earlier seminal publications like *Genome size and extinction risk in vertebrates,* Alexander E. Vinogradov, 7/14/2004, which disclose listed species are typically higher genome species.[93]

   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1691778/pdf/15306290.pdf.[94] [95]

41. Defendant EPA was informed, admits, knew or had reason to know prior to the publication of its 9/8/15 *Registration Review* due to higher genome sensitivity, even minute exposure, which would otherwise have minimal or no effect on a

---

[92] *Glyphosate's Suppression of Cytochrome P450 Enzymes and Amino Acid Biosynthesis by the Gut Microbiome:Pathways to Modern Diseases*, 4/10/2013, https://www.gmoevidence.com/wp-content/uploads/2013/04/GlyModern-diseaseSamsel-Seneff-13-1.pdf

[93] Doc 1, 126 [4/30/18 Notice] ("Vinogradov discloses a direct correlation between threatened species listed on the International Union for Conservation of Nature's (IUCN) Red List (http://www.iucnredlist.org/), their genome size and specie extinction probability.Vinogradov shows a higher probability of species extinction within virtually all given families, where the genome is higher in the threatened species (e.g. species of concern) than the lower genome non-threatened species (internal footnotes omitted).")

[94] Doc 1, 109 - 110 FN 8 ("*World's largest genome belongs to slow-growing mountain flower* [12/12/2010], https://www.telegraph.co.uk/news/science/science-news/8196572/Worlds-largest-genomebelongs-to-slow-growing-mountain-flower.html ("Dr Leitch said that having such a large genome could help explain why Paris japonica was so slow-growing and vulnerable to pollution and other extreme conditions... 'Having that much DNA take have consequences for the plant – plants with big genomes are at greater risk of extinction, more sensitive to pollution... means every time you want to divide a cell in order to grow, you have to replicate all that DNA and it takes a lot longer.'") ")

[95] https://www.sciencemag.org/news/2010/10/scienceshot-biggest-genome-ever (2010);

lower genome human or other mammal, will have a catastrophic effect on higher genome listed species.

42. Defendant EPA was informed, admits, knew or had reason to know prior to the publication of its 9/8/15 *Registration Review* that listed native bee species, like the Bombus affinis, would also be affected by glyphosate if the commercial honey bee was.

43. Defendant EPA was informed, admits, knew or had reason to know its discretionary act of preparing, making, publishing and taking comments in its 9/8/15 *Registration Review*, which disclosed honey bees may be negatively affected, applied to the *Bombus affinis* and other more environmentally sensitive invertebrate species, which inured to the benefit of listed species and hence triggered § 7 consultation.

44. Defendant EPA was informed, admits, knew or had reason to know its discretionary act of preparing, making, publishing and taking comments in its 9/8/15 *Registration Review* that higher genome listed plant species would also most certainly be adversely affected by glyphosate exposure.[96][97][98][99]

---

[96] Doc 1, 109 - 110 FN 8 ("*World's largest genome belongs to slow-growing mountain flower* [12/12/2010], https://www.telegraph.co.uk/news/science/science-news/8196572/Worlds-largest-genomebelongs-to-slow-growing-mountain-flower.html ("Dr Leitch said that having such a large genome could help explain why Paris japonica was so slow-growing and vulnerable to pollution and other extreme conditions... 'Having that much DNA take have consequences for the plant – plants with big genomes are at greater risk of extinction, more sensitive to pollution... means every time you want to divide a cell in order to grow, you have to replicate all that DNA and it takes a lot longer.'") ")

[97] https://www.sciencemag.org/news/2010/10/scienceshot-biggest-genome-ever (2010)

[98] Also see *Glyphosate Susceptibility of Different Life Stages of Three Fern Species,* 9/22/2015, http://www.bioone.org/doi/abs/10.1640/0002-8444-105.3.131 ("We conclude that even glyphosate concentrations of 0.33 g a.i. L-1 may negatively impact

45. Despite this knowledge EPA failed to conduct § 7 consultation.

46. Defendant EPA knew its discretionary act of preparing, making, publishing and taking comments in its 9/8/15 *Registration Review*, inured to the benefit of listed species, because Plaintiff in his 4/30/18 Notice/Comment filed and received by EPA during said Comment period disclosed such in detail, which thus triggered EPA's § 7 consultation duties.

47. Despite knowledge of Plaintiff's 4/30/18 disclosing how said 9/8/15 *Registration Review* inured to the benefit of lists species EPA non-the-less failed to conduct § 7 consultation.

48. Defendant EPA knew or should have known its discretionary act of preparing, making, and publishing the *Meeting December 13-16, 2016 and Then Transmitting Meeting Minutes and Final Report RE: Considering and Review of Scientific Issues Associated with EPA's Evaluation of the Carcinogenic Potential of Glyphosate To Acting Director Office of Pesticides 3/16/2017*, https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf, which raised epidemiologic and

---

natural spore banks of ferns and result in mortality of 31–50% of all green life stages. Such negative effects may also eliminate at least the most susceptible fern species in habitats that are frequently exposed to such glyphosate concentrations.")
[99] See Doc 1, 298, Plaintiff's 6/22/17 Declaration ("Monsanto's Roundup Triggers Over 40 Plant Diseases and Endangers Human and Animal Health, Jeffrey M. Smith, http://action.responsibletechnology.org/o/6236/t/0/blastContent.jsp?email_blast_KEY=1 150514 ("The actual plant assassins, according to Purdue weed scientists and others, are severe disease-causing organisms present in almost all soils. Glyphosate dramatically promotes these, which in turn overrun the weakened crops with deadly infections. 'This is the herbicidal mode of action of glyphosate... It increases susceptibility to disease, suppresses natural disease controls such as beneficial organisms, and promotes virulence of soil borne pathogens at the same time.'")")

genotoxicity animal test study concerns implicating listed species and inured to their benefit hence triggering § 7 consultation.

49. Despite this knowledge EPA failed to conduct § 7 consultation.

50. Defendant EPA knew or should have known its discretionary act of Conducting, publishing, preparing, making, communicating and taking comments in its *Glyphosate Proposed Interim Registration Review Decision* Case Number 0178, Posted May 6, 2019, https://www.regulations.gov/document/EPA-HQ-OPP-2009-0361-2344, which disclosed honey bees may be negatively affected, also applied to the *Bombus affinis,* a much more environmentally sensitive related *Bombus* species, and which disclosed concern over the Monarch Butterfly and its food source milkweed, inured to the benefit of listed species and triggered § 7 consultation.

51. Despite this knowledge EPA failed to conduct § 7 consultation

52. Defendant EPA knew or should have known its discretionary act of preparing, making, publishing and issuing its 1/20/20 glyphosate *Interim-Registration*, https://www.epa.gov/ingredients-used-pesticide-products/interim-registration-review-decision-and-responses-public, where EPA expressed environmental exposure and reduce risk to listed species whose range and/or critical habitat co-occur with the use of glyphosate, inured to the benefit of listed species, hence triggering § 7 consultation.

53. Despite this knowledge EPA failed to conduct § 7 consultation.

54. Defendant EPA knew or should have known its discretionary act of preparing, making, publishing and taking Public Comments of its *11/20/20 Draft National*

*Level Listed Species Biological Evaluation for Glyphosate* ("*Biological Evaluation* "), https://www.epa.gov/endangered-species/draft-national-level-listed-species-biological-evaluation-glyphosate; draft biological opinion, where EPA discloses that glyphosate likely adversely affects, modifies the critical habitat of approximately 759 listed species, inured to the benefit of listed species, hence triggering § 7 consultation.

55. Despite this knowledge EPA failed to conduct § 7 consultation.

56. EPA's inaction/delay in undertaking § 7 consultation in the presence of its discretionary acts mandating immediate § 7 consultation itself constituted a discretionary agency action mandating § 7 consultation.

57. EPA's inaction/delay in undertaking § 7 consultation in the presence of its discretionary acts mandating immediate § 7 consultation constituted an illegal "take."

58. Plaintiff believes the EPA should have long ago conducted its § 7 consultation with USFWLS, which would have precluded the on-going slaughter by FBEMC and has expressed this to USFWLS, including during his visit to them in Asheville 2019.

59. On or about 5/18/21 in the matter of *NRDC v EPA* (9th Cir) Nos. 20-70787, 20-70801 EPA filed a *Motion For Partial Remand Without Vacatur* suggesting its 1/22/21 *Interim Registration* may be defective regarding harm to listed species and that EPA needs to revisit its registration.

60. EPA's 5/18/21 *Motion For Partial Remand Without Vacatur* is an admission of its prior § 7 consultation failure, e.g. lack of prior requisite § 1536 (a)(2) consultation.

## EPA VIOLATES § 1536 (d) & IS TAKING LISTED SPECIES IN VIOLATION OF § 9

61. Defendant EPA either is or should be conducting consultation with USFWLS under § 1536 (a)(2), but is failing to comply with § 1536 (d) by allowing FBEMC to employ its registered glyphosate herbicide to take listed species on Roan Mountain and/or significantly adversely modify critical habitat.

62. EPA's admits its disregard to perform its duties under § 1536(d), because of its prior receipt of Plaintiff's 3/12/21 and earlier Notices showing glyphosate takes listed species, now particularly in view of EPA 11/20/20 BE admission of a likely adverse affect on listed species, because it has taken no measures to abate glyphosate's affect during its § 1536 (a)(2).

63. EPA's admits it has no evidence to permit the continued usage of Glyphosate by FBEMC during its § 1536 (a)(2) consultation, which shows FBEMC will not Take listed species and/or adversely modify their habitat, including critical habitat.

64. EPA admits it can provide no affirmative evidence necessary to continue the usage of glyphosate by FBEMC during its § 1536 (a)(2).

65. EPA admits its prior failure to § 1536 (a)(2) consult in view of multiple discretionary agency acts it took, which could inure to the benefit of listed species, yet failed to engage in said § 1536 (a)(2) consultation.

66. EPA admits it is now in § 1536 (a)(2) consultation yet allows continued usage glyphosate to take listed species in violation of § 9.

67. EPA admits its prior failure to conduct § 1536 (a)(2) consultation and its current failure to comply with § 1536 (d) allowing FBEMC to kill listed species constitutes EPA's take of listed species under § 9.

**[Note, The Following § 9 Allegations Are Generally Supported By Plaintiff's Notices (Attachment 3) and His 7/25/19 TRO Hearing PPT Presentation (Attachment 4) and Declarations (Attachment 5).]**

68. FBEMC's spraying of herbicides on Roan results in hydrous drift, which is more consequential than spray drift, because it is a highly toxic reaction product emitted from the soil after spraying, e.g. glyphosate, AMPA, formaldehyde and potentially herbicide co-ingredients/formulants ("toxins"). This drift is transported for great distances in humidity, rain, wind, air currents and ambient conditions (inversions) for many months after the spraying event. This hydrous drift mechanism contaminates listed species habitats and critical habitat over the entire mountain for long durations despite the spray site being miles away, inevitably leading to listed species death.

69. FBEMC need not spray much of Roan or any of it in order significantly adversely affect listed species and habitat. Roan is one of the highest mountains, if not the highest, residing on the eastern Continental Divide. Thus, she naturally attracts due to prevailing winds and normal conditions hydrous based weather (Clouds, Rain, Storms, Inversions). This allows distant spraying via hydrous drift to transport and then deposit on Roan.

70. For example, the last time FBEMC sprayed it high power transmissions lines just outside of Bakersville, about 6 miles away, its hydrous drift was transported to Roan and deposited for many months, contaminating the entire mountain. It would typically transmit via inversions or low lying clouds and often in the rain. It would literally rain toxic drift all over the mountain.

71. FBEMC's direct spraying of Roan due to the total miles of its ROW easements surrounding or transiting up into the mountain, within the span of a month or so introduces a continuous monumental toxic load due to hydrous drifting, dwarfing Roan's total agricultural and residential use of glyphosate based herbicides by many orders of magnitude, perhaps by a 1,000 times.

72. Non-the-less, Defendants FBEMC and Jeff Loven intend to/or are spraying registered herbicide *Rodeo* and *Polaris* in a manner they know or should know kills and severely injures listed species, significantly and adversely modifies protected species habitat on Roan Mountain, including designated critical habitat, and that damage is irreparable.

73. Defendants FBEMC and Jeff Loven know or reasonably should know the irreparable damage they are causing listed species and their habitats on Roan Mountain cannot be compensated by a monetary award after the fact.

74. Defendants FBEMC and Jeff Loven despite knowing the irreparable harm, which will occur to protected species and their habitat, including critical habitat, have or will imminently begin re-spraying their alleged "right of ways" (ROW) easements on Roan Mountain and proximity with a mixture of *Rodeo* and *Polaris*.

75. Defendants FBEMC and Jeff Loven admit their herbicide ROW spraying program consists of applying a highly concentrated herbicide mixture of Rodeo and Polaris in solution containing about 4.5% active ingredients by volume (Attachment 1).[100]

76. Defendants FBEMC and Jeff Loven know and admit this concentration level is significantly greater than normal agricultural and residential application concentration levels.

77. Defendants EPA, FBEMC and Jeff Loven admit, know or have reason to know FBEMC's spraying on Roan (due to hydrous and normal drift) introduces listed species, their habitats and critical habitat exposure to said hazardous toxins (including glyphosate) and if it doesn't kill the listed species directly, at a minimum severely debilitates their gut microbiome,[101] whereby said species loses their natural immunity to combat other stressors; including other pesticides and natural pathogens.[102] [103] [104]

78. Defendants EPA, FBEMC and Jeff Loven admit, know or have reason to know FBEMC's spraying on Roan (due to hydrous and normal drift) kills or poses an extinction risk for Roan's listed species, including the Bombus affinis (Rusty Patch Bumble Bee), Spruce fir Moss Spider, Gray bat, Northern long-eared bat, Virginia big-eared bat and other species where their gut microbiome has been compromised due to exposure to Glyphosate, AMPA and/or Formaldehyde.

---

[100] http://www.frenchbroademc.com/rightofway.cfm
[101] See Doc 1, p 12, 45, 65, 133, 201-203 [Plaintiff's 7/15/19 Notice]
[102] https://pubmed.ncbi.nlm.nih.gov/30249635/
[103] https://pubmed.ncbi.nlm.nih.gov/29992812/
[104] https://pubmed.ncbi.nlm.nih.gov/32651208/

79. Defendants EPA, FBEMC and Jeff Loven admit, know or have reason to know FBEMC's spraying on Roan (due to hydrous and normal drift) kills or poses an extinction risk for Roan's listed plant and other species, including the BlueRidge goldenrod, Heller's blazing star, Roan mountain bluet, Spreading avens, Virginia spiraea and/or Rock gnome lichen.

80. due to soil and water contamination of Glyphosate, AMPA and/or Formaldehyde and/or direct vegetative exposure to drift.

81. Defendants EPA, FBEMC and Jeff Loven admit, know or have reason to know FBEMC's spraying on Roan (due to hydrous and normal drift) poses an extinction risk for Roan's listed species due to Plaintiff's 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices.

82. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's Notices (individually or collectively) and from available scientific data/publication that depending on the level (intensity) and duration of exposure (which in the case of FBEMC's spraying is severe) and the particular species, listed species will experience premature death on varying timelines. The result is always being the same, near-term death or severe injury, including genetic, endocrine disruption, reproductive or other severe disability, where the species eventually dies and/or goes extinct, which is irreparably.

83. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's Notices (individually or collectively) and from available scientific data/publication that invertebrate (insect) death and their disappearance was extreme and sudden after FBEMC's 2017 spraying of its registered herbicides,

that vast numbers of insect species **suddenly** disappeared, not just the affinis, and have yet to return (see 7/15/19 Notice, Doc 1, p 201 to 207). [Note, those few remaining mostly have significant body mass reductions, a fraction of their former (pre-2017) size.]

84. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's Notices (individually or collectively) and from available scientific data/publication that exposure to glyphosate, either by inhalation, ingestion negatively impacts the Bombus affinis' foraging (food gathering) capabilities (Doc 1, p 209 [7/15/19 Notice]),[105] which eventually results in her death.

85. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's Notices (individually or collectively) and from available scientific data/publication that exposure to hydrous drift associated with FBEMC's spraying spreads mountain wide independent of site location, including into critical habitat, contaminating the air, which the species breath, water, foliage and soil, which severely adversely affecting listed specie habitat, and in the latter case (soil) results in the generation of excessive formaldehyde, killing listed dependent upon soil, which many are, like the Spruce fir moss spider and Bombus affinis, the later which hibernates and births their brood in soil.

86. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's Notices (individually or collectively) and from available scientific data/publication that exposure to hydrous drift associated with FBEMC's spraying

---

[105] *Effects of sublethal doses of glyphosate on honeybee navigation,* July 2, 2015
https://www.boerenlandvogels.nl/sites/default/files/Effects%20of%20Glyphosate%20on%20Honey%20Bee%20Navigation.pdf

kills, severely injures and significantly negatively affects listed species habitat by introducing disease to co-habitant species, like blight and deformation of plants and trees. In other words, co-habitant species also experience weakened immunities. In the case of the Spruce-fir moss spider her Douglas and other firs she lives under and depends upon to survive become diseased and prematurely die. This in turn kills the spider who dependent upon them.

87. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's Notices (individually or collectively) and from available scientific data/publication that exposure to hydrous drift associated with FBEMC's spraying kills, severely injures and significantly negatively affects listed species habitat, including critical habitat by contaminating listed species water and food sources, resulting in their death or severe disability. FBEMC's spraying has decimated insect populations in general on the mountain, including moths, which are a primary food source for Roan's listed specie bats. Contaminated months are eaten by listed bats, which poison the bat debilitating his immune system, where he later dies unable to defend against pathogens. Sufficient moths populations no longer remain because of FBEMC's spraying and thus are no longer a food source for the listed bats, which starve to death.

88. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's Notices (individually or collectively) and from available scientific data/publication that prolonged continued exposure to FBEMC's hydrous drift magnifies the irreparable death, injury of listed species and the significant adverse

destruction of their habitats, including critical habitat, because the long term

nature of hydrous emissions can last up to a year or more after a spraying event.

89. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's

Notices (individually or collectively) and from available scientific

data/publication that each spraying event by FBEMC geometrically increases

listed species death and the significant adverse destruction of their habitats,

including critical habitat, because the time necessary to heal a habitat, offering a

chance of renewal for the listed species is cut short, effectively killing the already

weakened remaining listed species. [Thus, the effect of FBEMC's 2 year

respraying cycles[106] further kills listed species and worsens the significant adverse

destruction of their habitats, including critical habitat compared to the prior

spraying event and presents an extinction risk to the species.]

90. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's

Notices (individually or collectively) and from available scientific

data/publication that each FBEMC's re-spraying event irreparably geometrically

increases listed specie death and the significant adverse destruction of their

habitats, including critical habitat. A third spraying will be irreparably

catastrophically devastating compared to FBEMC's last (second 2019 spraying),

which was worse than its first (2017) spraying.

91. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's

Notices (individually or collectively) and from available scientific

data/publication that direct exposure, for example species residing in a sprayed

---

[106] FBEMC's instant 2021 spraying will be its 3rd in 6 years. Its first was in 2017, the second in 2019.

FBEMC ROW easement, results in more or less instantaneous death of the listed species, particularly insect species (Bombus affinis, Spruce-fir moss spider) and a lingering death for listed plants and exposed mammal species. It directly contaminates habitat which listed species depend for food or which visit, and results in their eventual death or severe disability, including genetic, endocrine disruption, reproductive or other disability.

92. Defendant EPA admits, knows or has reason to know due to receipt of Plaintiff's Notices (individually or collectively) and from available scientific data/publication that FBEMC's spraying of EPA registered herbicides represents an illegal take of Roan's listed species.

**JEFF LOVEN**

93. The ultra-vires Allegations regarding Jeff Loven made in Plaintiff's 12/5/19 Amended Complaint in *226*, Doc 29, p 22-31, are incorporated by reference and made as if set forth herein. Further Allegations include:

94. Defendant Jeff Loven in his individual capacity did callously, purposely, knowingly and intentionally misrepresent the safety of herbicides to the FBEMC's Board of Directors and Membership, including their likely adverse impact on listed species, in order to obtain necessary approval for their usage.

95. Defendant Jeff Loven continues this deceit not informing his Board or Membership of damage FBEMC's herbicide program is doing to listed species, their habitat and critical habitat.

96. Defendant Jeff Loven's misrepresentation has been continuous and evident today on FBEMC's web site, which states: "Rodeo and Polaris is *safe for birds, fish, and*

*honeybees*, Attachment 1, [107] knowing full well having been personally served and otherwise personally in receipt of each of Plaintiff's 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices, this is categorically untrue for listed species.

97. Defendant Jeff Loven deceitfully secured approval or never legally obtained approval from his Board and Members to conduct FBEMC's herbicide ROW spraying program.

98. Defendant Jeff Loven illegally secured approval or never legally secured approval from his Board and Members and is directing FBEMC's herbicide program in an Ultra vires capacity.

**STANDING**

99. Plaintiff organized the weaning years of his life so he could be away from the pollutants, stressors of city life[108] and low frequency banal human contact; to enjoy fresh/pure air, pristine/pure waters and fertile/uncontaminated soils; to commune/live/mediate/ pray with, enjoy and study the glory of nature and the protected species of Roan mountain with whom he lives and so dearly loves. In other words, the habitat these protected species occupy/reside is the very same habitat Plaintiff resides and lives year round.[109]

100. Plaintiff William Orr is a hermit[110] who lives alone[111] far from any humans[112] full time, deep in nature[113] together with incredibly rare listed

---

[107] This misrepresentation has been continuous and seen by Plaintiff since 2017 on FBEMC's web site, http://www.frenchbroademc.com/rightofway.cfm
[108] (Doc 1, p 18)
[109] (Doc 29, generally and p 14).
[110] (Doc 1, p 278)
[111] (Doc 1, p 220 -227)
[112] (*Id.,* Doc 29, p 54)

creatures,[114] who breaths their same air, smells its delightful fresh fragrance, alive in it, shares their same water, shares/used the same soil and plants they use/and pollinate; who he loves, who he talks with, dances and sings with, who enjoys their flirting, who feeds, hikes the mountain among them;[115] scientifically studies and chronicles them;[116] studies and photographs[117] their habitats, including critical habitats,[118] watches their art, listens to their incredible music; who knows they are entertaining him and he applauds; who feels their incomprehensible pure and innocent love;[119] who works to preserve and keep their habitats pure; who works to conserve them;[120] who he communes/ meditates, prays and communicates with;[121] who he is one with them living a shared paradise;[122] who he benefits immensely from their visiting/pollinating his garden;[123] orchard, plants and flowers,[124] to warning him of pending danger; who he learns from - by their very

---

[113] (Doc 1, p 278)

[114] (*Id.*)

[115] (Doc 1, p 220; Doc 29, p 57 ¶ 15)

[116] (Doc 29, p 56, Doc 1, p 279)

[117] Plaintiff spent thousands of dollars on camera/video and sound equipment for this purpose. Regrettably, due the deformation and destruction of specie habitat and the shock, negative emotional response felt by Plaintiff due to such damage, he does not use it. When habitats can be repaired and species return Plaintiff will be emotionally motivated to reuse it. He expects too and wants to use it again.

[118] (Doc 29, p 57-8)

[119] (*Id.*)

[120] Doc 29, p 58; p 78 ¶ 77 ("So, I was selfishly helping my son maintain these easements to save protected species..."), Doc 1, p 15 ("Orr also has assisted his son in the clearing of ROW easements containing protected species and their habitat, in order to avoid FBEMC's herbicide spraying thereof, so that protected species might survive."); Doc 1, p 29 [¶ 36], 283, 301.

[121] (Doc 1, p 221)

[122] Attachment 2 (6/1/17 Complaint [Doc 1] in *Orr 141),* p 53

[123] (Doc 1, p 17)

[124] (Doc 29, p 57)

91

presence; who benefits from their love[125] (and vice versa);[126] who set up a legal foundation in order to learn and help others to communicate with them and for their conservation;[127] who legally fights for them when idiot humans are trying to kill them and destroy their precious pure habitats, including critical habitats;[128] who really feels their pain and suffering as his very own (because it truly is);[129] where when they're harmed he's harmed (emotional, spiritually[130] and physically[131] and actually cries[132] sometimes for days on end;[133] where when they're harmed and no longer visit him and pollinate his orchard, garden and flowers, where he can no longer observe, study them,[134] enjoy their presence and try to conserve them,[135] he is also injured.

101.     Plaintiff's relationship with precious listed species is not incidental, but rather full time and year round. It is enduring, deeply intimidate,[136] personal,

---

[125] (Doc 1, p 279)

[126] (Doc 1, p 16)

[127] Doc 1 p 279. Plaintiff organized *Talk to Nature Foundation's* (TNF), a non-profit entity, which was a co-Notice/Comment maker of The 4/30/18 Notice, where it is disclosed its "mission includes the preservation of all forms of nature in its original purity as intended by Creator, and preserving ESA critical habitat, endangered and threatened species ..., including if necessary via litigation pursuant to the Endangered Species Act, 16 U.S.C. §§ 1533-44, § 1540(g)**(1), § 1540(g)(2)(A)(i), 16** U.S.C. § 1536 (a)(2), et. seq. (ESA) (internal FN's omitted, emphasis added) (Doc 1, p 108)

[128] To wit, Plaintiff's 2017 and 2019 ESA suits.

[129] (Doc 1, p 288-90, 298, Doc 29, p 65 -67)

[130] Doc 1, p 16, 220, 221, 222, 224, 252, 311 at 311("The vibratory frequency of the Mountain has taken a major hit. This was evident in my last meditation. My intimate spiritual relationship with her, the precious species and life forms on her, has taken a very serious hit.")

[131] (Doc 1, p 288)

[132] (Doc 29, p 73 ¶ 56 ¶ 57; Doc 1, p 18)

[133] (Doc 1, p 311)

[134] (Doc 29, p 58)

[135] (Doc 29, p 59 ¶ 19; p 19 ¶ 20)

[136] (Doc 1, p 17),

physical, scientific, emotional and spiritual,[137] Plaintiff does not have regular human friends he meets or visits. His human contact is rather infrequent. Plaintiff's best friends are his cat, the precious species here, including listed species (which are at the top of his list), nature, the Mountain and its animals and plants, who he has learned to communicate with.

102.     This magic Plaintiff enjoyed and his efforts were all suddenly stolen from him when FBEMC first sprayed in 2017.[138] The sudden and mortal injury and disappearance of these precious listed species deeply wounded Plaintiff. The pure and undefiled nature he once enjoyed and shared with them (e.g. living together in their same habitats) was lost, [139] [140] he had to share their same contaminated air, water, soil and vegetation. He lost his best friends, dance partners, fellow artists/creators, mentors and advisors. He lost the innocence and their unconditional love. Plaintiff lost the subjects of his scientific study, chronicling, photography, observation and enjoyment;[141] he lost his recreational hiking amongst them; [142]he has lost the pollinators of his flowers, plants, orchard and garden; he lost the pure uncontaminated surface water and soil which both these precious species and Plaintiff depend upon;[143] he lost the pollinators of his garden, orchard, plants and flowers; he lost his efforts to protect their habitats and

---

[137] (*Id.*, Doc 1, p 279, 7/25/19 TRO Hearing, Doc 29, p 54, 71).
[138] (Doc 1, p 181).
[139] (Doc 1, p 278)
[140] Each successive FBEMC spraying from their first 2017 to their 2019 inflicts non-linear injury to listed species and critical habitat (Doc 28, p 6)
[141] (Doc 28, p 5)
[142] (Doc 29, p 81 ¶ 87)
[143] Bombus affinis (aka Rusty Patch Bumble bee) hibernates and births their young in soil (Doc 29, p 77)

to conserve them;[144] he also sadly lost a deep holy spiritual[145] and intimate emotional, personal and spiritual connection[146] to these precious creatures[147] and to this remarkable mountain,[148] **This made Plaintiff literally cry!** [149] [150] [151] [152] [153]

103.     Plaintiff William Orr previously worked together with his son in self maintaining FBEMC easements so that they might not be sprayed, including some of the highest altitude easements on Roan. He did so for the purpose of preventing the death/harm of listed species residing on those easements and from hazardous hydrous and other drift migrating into their habitats, including critical habitat, where said drift would significantly adversely modify their habitat, kill and/or severely injure listed species.

104.     Despite being aware of this self-maintenance effort and having previously honored their agreement with Plaintiff's son not to spray said easements, FBEMC non-the-less in 2019 did spray them, even though they had been properly self-maintained like previously, destroying Plaintiff's conversation efforts and significantly adversely affecting listed specie habitat, killing and/or severely

[144] (Doc 28, p 4; Doc 29, p 79 ¶78, p 79 ¶ 80, p 79 ¶ 81)
[145] Spiritual injury is recognized in *Karuk,* 681 F.3d at 1019.
[146] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (Intangible injury constitutes injury in fact).
[147] (Doc 28, p 6 )
[148] (Doc 29, p 75).
[149] (Doc 1, p 311 ¶116,
[150]Doc 1, p 311 ¶116 ("**I cry for them** when I think of their purity and innocence being stolen. **I cry for them** because of the introduction of disease/genetic damage, because of the introduction of herbicides, which did not exist before. **I have been crying and saddened for days** now...(emphasis added).")
[151] Doc 29, p 81-83; 81 ¶ 88
[152] Aesthetic injury is recognized in *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998); *Natl. Audubon Socy. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)
[153] Doc 1, p 102 ("**My Heart is Crying for the Roan!** (emphasis in original)")

injuring them. This destroyed Plaintiff's ROW easement conversation efforts and made him weep.

105.     Plaintiff organized Talk to Nature Foundation ("TNF"), a North Carolina non-profit corporation, which has as one of its express purposes the conservation of listed specie habitat. In this regard, TNF's incorporation documents provide for the acquisition of undeveloped wilderness property conducive for listed specie conservation. A prospective property Plaintiff was eyeballing included about 200 acres of wilderness underneath Roan's peak extending into, abutting and/or near Roan's critical habitat. This was a property filled with various listed species.

106.     Regrettably, this property was severely contaminated by hydrous drift subsequent to FBEMC's spraying, particularly after its second 2019 spraying. Consequently, Plaintiff's efforts were tabled, injuring his conservation effort.

107.     At this point, Plaintiff's assessment is positive and that he can go back to work on investigating the acquisition of said property, because listed species habitats appear to be gradually repairing themselves and in time should eventually return, providing for an opportunity for the renewal/invigoration of listed species, assuming no further FBEMC spraying.

108.     Thus, if FBEMC's spraying of EPA registered herbicides immediately ceases, Plaintiff's observational evidence suggests listed species habitats will eventually repair themselves to a level that Plaintiff will see their return, and in the case of the Bombus affinis she will return one way or the other. Plaintiff desires to reengage his conservational efforts via TNF and will do so, assuming no further FBEMC spraying. He will also re-engage in his scientific,

observational, photographic, recreational and other efforts regarding listed species and their habitats, which he lost after FBEMC spraying, again assuming no further spraying.

109.     If listed specie habitats are allowed to fully repair themselves by a cessation of further FBEMC herbicide exposure and if perchance in the unlikely event the *affinis* does not return, Plaintiff has been informed by an invertebrate (insect) expert (Dr. Richard McDonald) that she can be re-introduced, along with other insects that have (hopefully) only temporarily disappeared also. Plaintiff intends to use the auspices of TNF foundation for this reintroduction of species undertaking, if required.

110.     If on the other hand FBEMC's spraying of EPA registered herbicides continues, is not ceased, Plaintiff will be irreparably injured, unable to conduct his effort intended to conserve listed species, nor will he be able to conduct his other listed species  scientific, observational, video chronicling, photographic, recreational activities.

111.     Naturally, when the *affinis* disappeared after FBEMC first sprayed in 2017 and again in 2019, plaintiff lost his scientific, observational, video chronicling, photographic, recreational, spiritual and emotional connection/efforts related to them. Their return will allow him to renew this, but that can only happen if FBEMC does not spray again.

112.     Roan is a treasure beyond treasons. Many of her rare native species are tens of thousands if not millions of years old, perhaps even older, including her precious listed species. Many of her rare native species are still likely unknown.

Some of her species can live very long lives, including for example her popular common non-listed species Rhododendron, which lives for hundreds of years. The Rhododendron and its prolific "original" native presence, just like the Fraser and Douglas firs (where your Christmas tree came from), are examples of how truly rare and remarkable Roan is! This treasure if being quickly lost due to FBEMC's spraying!

The afford mentioned Allegations are further supported by the attached Declarations (Attachment 5), Plaintiff's 7/25/19 TRO PPT Presentation (Attachment 4) and his 5/26/17, 4/30/18, 7/5/19, 3/12/21 Notices (all contained in Attachment 3).

## CLOSING REMARKS

While Plaintiff knew another FBEMC spraying event would occur, he had hoped it might be in couple of years or so, not this summer, not so soon after FBEMC's last 2019 spraying. He just learned of FBEMC's intentions 5/26/21 to imminently spray and has hurriedly prepared this pleading so that the Court might enjoin it before it occurs. Consequently, Plaintiff who is already preoccupied with an Appeal in *226*, in addition to his other time consuming responsibilities on the mountain, will likely need to Amend this Complaint and supplement the record.

Plaintiff has asked in a separate concurrent Motion an opportunity to file electronically via ESF, like he has been permitted before the 4th Circuit. If granted, he would like to electronically resubmit those Attachments, which have evidentiary color photos, which cannot be fairly considered in a black and white format, so they might be properly considered by the Court. These would include his 7/25/19 TRO PPT Presentation (absent embedded videos) and his 3/12/21 Notice.

Pro-se Plaintiff has no experience or expertise in complex environmental law and is struggling. Because he is a Pro-se litigant is entitled deference, kindly requests the Court, if necessary, to guide him in asserting a plausible claim. Even seasoned environmental law attorneys in this complex arena enjoy this courtesy, see *Center for Biological Diversity v. EPA*, No. 14-16977, p 9-10 (9th Cir. 2017) ("The district court directed CBD to allege a specific affirmative act by the EPA that would trigger Section 7 consultation for each of the alleged pesticide active ingredients or pesticide products.")

Respectfully Submitted,

William Orr, June 7, 2021

**ATTACHMENTS**

1. 5/26/21 FBEMC's Notification of Roan Spraying (2 pages)

2. 7/9/20 US PTO Patent Application *Virus Eradication By Resonance Frequency Deactivation Of Genetic Material* (1 page)

3. 3/12/21 Notice *Comment and Continuing § 9 Take Notice and Intention to Sue ESA §1540(g)* (Body 86 pages, Attachments A-E 169 pages, Total 255 pages)

4. 7/35/19 TRO PPT Presentation [Absent Embedded Videos and Oral Presentation] (154 pages)

5. Declarations (Previously Submitted in *226*) (154 pages)

**VERIFICATION:** I, William Orr, Pro-Se Plaintiff to the extent I have personal knowledge of the facts stated above, hereby swear under the pains and penalties of perjury that these facts are true and accurate, to the best of my knowledge and belief.

William Orr, 6/7/2021

**CERTIFICATE OF SERVICE**

I certify that all parties below have or will be send today by email a true and accurate copy of the pleadings of this day, including the Verified Motion for an Emergency Temporary Restraining Order, a Proposed TRO ORDER and this Verified Complaint:

- Ms. Jamie Stokes for FBEMC (jamie.a.stokes@gmail.com; stokeslawoffice@bellsouth.net);

- Mr. Jeff Loven, personally and registered agent FBEMC (jeff.loven@frenchbroademc.com);

- Mr. Jonathan D. Letzring, Assistant United States Attorney (jonathan.letzring@usdoj.gov) for the Dept of Interior, Dept of Commerce, U.S. EPA, U.S. Forest Service, U.S. Fish And Wildlife Service.

**FRCP 65(B) COMPLIANCE**
**SERVICE**

I, William Orr certify that I will immediately serve a true and accurate copy of the pleadings of this day, including Plaintiff's Verified Motion for an Emergency Temporary Restraining Order, a Proposed TRO ORDER and Verified Complaint to named Defendants FBEMC, Jeff Loven, U.S. DOI, U.S. EPA, U.S. Forest Service, U.S. Fish and Wildlife Services as soon as possible separately to their addresses below via certified mail, return receipt requested.

DEFENDANTS:
(Via Service)

Jeff Loven, Personally and as General Manager/Registered Agent
for French Broad Electric Membership Corporation
3043 Highway 213
PO Box 9

Marshall, NC 28753
Phone: (828) 649-2051
jeff.loven@frenchbroademc.com

French Board Electric Membership Corporation
Ms. Jamie A. Stokes, General Counsel
jamie.a.stokes@gmail.com
stokeslawoffice@bellsouth.net
FAX 82882588754
One Oak Plaza, Suite 207
Asheville, NC 28801
828-348-4774
828-253-3661

Honorable Michael S. Regan,
Administrator U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Honorable Vicki Christiansen,
Chief of the U.S. Department of
Agriculture USDA Forest Service
Sidney R. Yates Federal Building
201 14th Street, SW
Washington, DC 20024

Honorable Deb Haaland
Secretary of Interior
Department of the Interior
1849 C Street, N.W.
Washington DC 20240

Honorable Gina M. Raimondo,
Secretary of Commerce
1401 Constitution Ave NW
Washington, DC 20230
(202) 482-2000.

Honorable Martha Williams, Principal Deputy Director
Acting Director, U.S. Fish and Wildlife Service
Department of the Interior
1849 C Street NW, Room 3331
Washington, D.C. 20240-0001

(Via Email)
Ms. Janet Mizzi, Field Office Supervisor

US Fish & Wildlife Service
160 Zillicoa St, Asheville, NC 28801
janet_mizzi@fws.gov

_William Orr_

William Orr, 6/7/2021