UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:21-cv-149-MOC-WCM

| WILLIAM ORR, | ) |  |
|---|---|---|
| Plaintiff, pro se, | ) | |
| vs. | ) | **ORDER** |
| U.S. EPA, et al., | ) | |
| Defendants. | ) | |

**THIS MATTER** comes before the Court on the following motions: a Motion to Dismiss, filed by Defendants French Broad Electric Membership Corporation ("FBEMC") and Jeff Loven, (Doc. No. 22), a Motion to Dismiss filed by Defendants U.S. Department of Interior ("DOI"), U.S. Environmental Protection Agency ("EPA"), U.S. Fish and Wildlife Service ("FWS"), and U.S. Forest Service ("USFS") (collectively referred to as the "Federal Defendants"), (Doc. No. 37); and pro se Plaintiff William Orr's Verified Urgent Emergency Motion for Immediate Temporary Injunction Order, (Doc. No. 53).

**I. BACKGROUND**

I. The Endangered Species Act

Section 7 of the Endangered Species Act ("ESA") directs federal agencies to ensure, in consultation with FWS or the National Marine Fisheries Service ("NMFS") (interchangeably, the "consulting agency"), that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). The term "action" is defined as "all

1

activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02. If the agency proposing the relevant action ("action agency") determines that the action is "likely to adversely affect" listed species or critical habitat, Section 7 requires the action agency to initiate formal consultation with the consulting agency. Id. §§ 402.13-402.14; see also id. § 402.45 (providing for potential alternative procedures if a Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") action is not likely to adversely affect listed species or critical habitat). In formal consultation, the consulting agency must prepare a biological opinion stating whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.14, 402.46.

Pursuant to Section 7(d) of the ESA, "[a]fter initiation of consultation required" by Section 7(a)(2), "the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d).

Section 9 of the ESA makes it unlawful for any person to "take" endangered species or engage in other prohibited acts regarding species protected under the ESA. 16 U.S.C. § 1538(a)(1)(B). To "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct" that would affect an endangered species. Id. § 1532(19). If an individual knowingly commits one of the prohibited acts under Section 9, absent a few statutory exceptions, they "may be assessed a civil penalty" by FWS or face criminal prosecution, at the Secretary's discretion. Id. § 1540(a)(1), (b).

The ESA citizen-suit provision allows any person to commence a civil suit, in relevant part, to "enjoin any person . . . alleged to be in violation of" the ESA or its regulations. Id. § 1540(g)(1)(A). A person can commence a citizen suit under this provision only if he provides written notice of the violation at least 60 days prior to filing suit to the Secretary and any alleged violator of the ESA. Id. § 1540(g)(2)(A).

II. The Federal Insecticide, Fungicide, and Rodenticide Act

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y, governs the sale, distribution, and use of pesticide active ingredients and pesticide products. The Act makes it unlawful, subject to certain exceptions, for any "person in any State [to] distribute or sell to any person any pesticide that is not registered" under the Act. 7 U.S.C. § 136a(a); see also 7 U.S.C. § 136j(a)(1)(A). EPA will only register a pesticide active ingredient or pesticide product if, inter alia, "it will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5).

Congress included a provision in FIFRA that requires EPA to continuously review registered pesticides every 15 years (a process known as registration review). Id. § 136a(g); see also 40 C.F.R. pt. 155. During registration review, EPA examines data to determine whether registered pesticides still meet FIFRA's requirements. EPA will create a "registration review case" for one or more active ingredients in a pesticide and all of the products containing such ingredients, establish a docket for public participation, and provide an opportunity for comment. 40 C.F.R. §§ 155.42, 155.50. During a registration review, EPA may determine that certain label restrictions are appropriate. See id. § 155.58(b)(2), (4).

EPA need not tackle the entirety of the registration review at once, but rather may make an "interim registration review decision." Id. § 155.56. "Among other things, the interim

3

Case 1:21-cv-00149-MOC-WCM   Document 64   Filed 11/21/22   Page 3 of 20

registration review decision may require new risk mitigation measures, impose interim risk mitigation measures, identify data or information required to complete the review, and include schedules for submitting the required data, conducting the new risk assessment and completing the registration review." Id. A FIFRA registration remains effective until EPA cancels it, which is a statutorily defined administrative action subject to specific safeguards. See 7 U.S.C. § 136d(b); 40 C.F.R. § 155.40; Reckitt Benckiser Inc. v. EPA, 613 F.3d 1131, 1134 (D.C. Cir. 2010).

### A. Plaintiff's factual allegations

Plaintiff alleges that he lives on Roan Mountain in North Carolina, where he enjoys a conservational and scientific interest in numerous species of flora and fauna on Roan Mountain, including species listed as endangered or threatened under the ESA. (Compl. at 6, 90–94). Plaintiff seeks to enjoin FBEMC and Jeff Loven, personally and as General Manager of FBEMC, from spraying its right-of-way easements on Roan Mountain with herbicides containing glyphosate. Plaintiff contends that the use of herbicides containing glyphosate adversely affects a number of ESA-listed species that live on Roan Mountain. (Id. at 18–19). Plaintiff alleges FBEMC planned to conduct spraying in May and June 2021, id. at 14, and Plaintiff further believes that this spraying will resume sometime in the future.

Plaintiff also generally claims that, with respect to its registration review of herbicides containing glyphosate under FIFRA, EPA should be enjoined to comply with ESA Section 7(d) during its Section 7(a)(2) consultation with FWS and/or should be required to initiate consultation under Section 7(a)(2). (Id. at 3, 21–22). Plaintiff further alleges that Federal Defendants are "taking" listed species in violation of Section 9 the ESA. (Id. at 4).

### B. Glyphosate registration review

Glyphosate is an active ingredient found in various pesticide/herbicide products. It is the most commonly used agricultural herbicide in the United States. The first pesticide product containing glyphosate was registered in 1974.1 See (https://www.epa.gov/ingredients-used-pesticide-products/glyphosate (last visited Sept. 7, 2021)). Pursuant to the registration review mandate, EPA formally initiated registration review for glyphosate in 2009. (Id.).

On January 22, 2020, EPA released its Interim Registration Review Decision on glyphosate ("Interim Decision"). See (Interim Decision (attached as Ex. 1), available at https://www.epa.gov/sites/default/files/2020-01/documents/glyphosate-interim-reg-review-decision-case-num-0178.pdf (last visited Sept. 7, 2021)). The Interim Decision summarized EPA's conclusions (as of the date of signature) on the risks and benefits associated with glyphosate. (Id.). EPA concluded that certain measures would be appropriate to mitigate potential ecological risks posed by glyphosate. These include (1) restrictions on how and when glyphosate can be sprayed, in order to reduce drift of such sprays, (2) an advisory warning of effects to "non-target organisms," and (3) recommendations to slow the development and spread of herbicide-resistant weeds. (Id. at 15–18).

The Interim Decision noted aspects of EPA's registration review that EPA had not yet finalized.[2] This included ESA consultation. (Id. at 3). EPA stated it will "will complete its listed

---

[1] "A federal court may take judicial notice of factual information located in postings on governmental websites in the United States." Johnson v. Clarke, No. 7:12CV00410, 2012 WL 4503195, at *2 n.1 (W.D. Va. Sept. 28, 2012) (citations omitted); Williams v. Long, 585 F. Supp. 2d 679, 686–88 & n.4 (D. Md. 2008) (collecting cases indicating that postings on government websites are inherently authentic or self-authenticating).

[2] Additionally, on May 18, 2021, EPA moved to voluntarily remand without vacatur portions of the Interim Decision analyzing ecological risks and other potential (non-human health) costs associated with glyphosate. See ECF No. 82-1, Motion for Partial Remand Without Vacatur, Nat'l Res. Def. Council v. U.S. EPA, No. 20-70787 (9th Cir. filed May 18, 2021).

species assessment and any necessary consultation with the Services for glyphosate prior to completing the glyphosate registration review." (Id.).

In November 2020, EPA issued and solicited public comment on a draft Biological Evaluation, analyzing the potential effects of glyphosate on 1,795 ESA-listed species and 792 designated critical habitats. See (Draft National Level Listed Species Biological Evaluation for Glyphosate ("draft Biological Evaluation"), available at https://www.epa.gov/endangered-species/draft-national-level-listed-species-biological-evaluation-glyphosate (last visited Sept.7, 2021)). EPA is in the process of considering public comments and developing its final Biological Evaluation. As EPA explained in a press release, "[b]iological evaluations are the beginning of EPA's [ESA] consultation review process for pesticides where the agency determines whether the pesticide 'may affect' one or more individuals of a listed species and their designated critical habitats." (EPA Releases Draft Biological Evaluation for Glyphosate ("Press Release") (Nov. 25, 2020), available at https://www.epa.gov/pesticides/epa-releases-draft-biological-evaluation-glyphosate (last visited Sept. 7, 2021)).[3]

If the final Biological Evaluation concludes that glyphosate is likely to adversely affect any ESA-listed species (as the draft Biological Evaluation tentatively concluded), EPA will initiate formal consultation with FWS and/or NMFS. (See id.). In other litigation, EPA has informed the courts that it intends to complete its final Biological Evaluation for glyphosate and, if warranted, initiate ESA consultation by November 12, 2021. (Ctr. for Biol. Diversity, et al. v. EPA, No. 3:11-cv-00293-JCS (N.D. Cal.), Stip. Partial Settlement Agreement (ECF No. 364 at 3,

---

[3] Federal Defendants interchangeably use the terms "biological assessment" and "Biological Evaluation." Although EPA uses the latter term to describe its document, it fulfills the purpose of a "biological assessment" as described in the ESA regulations. See 50 C.F.R. § 402.12.

6 ¶ 2); see also id. at ECF No. 383 at 2, ¶ 1; Nat. Res. Def. Council v. EPA, No. 20-70787 (9th Cir.), Merits Brief (ECF No. 80-1 at 80)).

**C. Procedural History**

This is the third lawsuit filed by Plaintiff seeking to enjoin FBEMC's spraying of herbicides and various federal actions related to herbicide products containing glyphosate. This Court dismissed Plaintiff's first lawsuit sua sponte on June 5, 2017, in part because Plaintiff failed to meet the statutory 60-day-notice requirement applicable to ESA citizen suits. Orr v. EPA, No. 1:17-cv-00141-MR-DLH, 2017 WL 2434779, at *1–2 (W.D.N.C. June 5, 2017) ("Orr I"). Plaintiff appealed the decision to the Fourth Circuit, but the appeal was dismissed for failure to prosecute. Orr v. EPA, No. 17-1705, 2017 WL 5997422 (4th Cir. Aug. 7, 2017).

On July 19, 2019, Plaintiff filed a second lawsuit and motion for a temporary restraining order ("TRO"), again seeking to stop FBEMC's spraying of herbicides on its right-of-way easement on Roan Mountain by bringing claims against FBEMC and several federal agencies. See Compl., ECF No. 1, Orr v. EPA, No. 1:19-cv-00226 (W.D.N.C. filed July 19, 2019) ("Orr II"); Mot. for TRO, ECF No. 3, Orr II, No. 1:19-cv-00226 (W.D.N.C. filed July 19, 2019). On August 6, 2019, this Court denied Plaintiff's motion for a TRO as moot, because the spraying in Plaintiff's area had already been completed for the year. Order, ECF No. 12, Orr II, No. 1:19-cv-00226 (W.D.N.C. Aug. 6, 2019). On December 5, 2019, in response to motions to dismiss filed by Federal Defendants and FBEMC Defendants, Mr. Orr moved to amend his complaint. See Joint Motion for Leave to File Out of Time and to File Amended Complaint, ECF No. 29, Orr II, No. 1:19-cv-00226 (W.D.N.C. filed Dec. 5, 2019).

With leave of court, Mr. Orr filed his amended complaint in the Orr II case on January 14, 2020. Plaintiff's amended complaint alleged that FBEMC's planned spraying of herbicides

7

on its right-of-way easements on or near Roan Mountain violated Section 9 of the ESA and that the federal agencies also violated the ESA "by failing to enforce/apply the provisions of ESA and its regulations, allowing FBEMC to employ EPA registered herbicides in such a manner to adversely modify protected species habitats and illegally 'Take' threatened/endangered species in violation of ESA § 9." See Am. Compl. at 1, 10, ECF No. 36, Orr II, No. 1:19-cv-00226 (W.D.N.C. filed Jan. 14, 2020) (hereinafter "Orr II Am. Compl."). Plaintiff also alleged that EPA and FWS had violated Section 7(a)(2) of the ESA by failing to engage in consultation. Id. at 10 (citing ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2)). Plaintiff additionally raised FIFRA claims, challenging EPA's registration of various herbicides, including glyphosate-containing herbicides. Id. at 11. Plaintiff recognized that "EPA may be undergoing a re-registration review for Glyphosate." Id. at 13.

On May 15, 2020, this Court granted Federal Defendants' and FBEMC Defendants' motions to dismiss Mr. Orr's amended complaint and dismissed the case with prejudice. Orr II, No. 1:19-cv-00226-MOC-WCM, 2020 WL 2512985 (W.D.N.C. May 15, 2020). On the claims that FWS and EPA violated Section 7 or Section 9 of the ESA by allowing the use of herbicides that allegedly harmed listed species, the Court held that Plaintiff had not satisfied the ESA's 60-day-notice requirement. Id. at **5–7. The Court further held that "Plaintiff's claim that the federal Defendants are violating the ESA for failing to monitor, enforce, or otherwise apply the ESA against third-parties in violation of ESA's Section 9 is not cognizable as a matter of law." Id. at *7. The Court next determined that it lacked "jurisdiction to consider any claim challenging the FIFRA registrations of Glyphosate and Imazapyr (Rodeo and Polaris), as FIFRA's jurisdictional provision (7 U.S.C. § 136n) is not satisfied here." Id. at *9 (footnote omitted). In addition, even if the Court had jurisdiction, many of Plaintiff's FIFRA complaints

8

involved actions that were past the six-year statute of limitations or were not final agency actions subject to judicial review. Id. The Court also made clear that "[t]o the extent Plaintiff's Amended Complaint alleges the ESA citizen-suit provision (16 U.S.C. § 1540(g)(1)(A)) gives this Court subject-matter jurisdiction to entertain a request to cancel FIFRA-registered herbicides/pesticides, such claim fails as a matter of law." Id. (footnote omitted). Finally, the Court held that Plaintiff lacked standing because he had not alleged an adequate concrete, particularized, actual, or imminent injury in fact or the required causal connection. Id. at *12. Plaintiff appealed the Court's order dismissing his claims, and the case is currently pending before the Fourth Circuit. See Orr v. EPA, No. 21-1222 (4th Cir.).

On June 7, 2021, Plaintiff filed a motion requesting this Court to stay its May 15, 2020, order dismissing with prejudice his claims in the Orr II case, pending the outcome of his appeal to the Fourth Circuit. See Mot., ECF No. 60, Orr II, No. 1:19-cv-00226 (W.D.N.C. filed June 7, 2021). This Court denied Plaintiff's motion to stay the effect of the Orr II decision. See Order, ECF No. 64, Orr II, No. 1:19-cv-00226 (W.D.N.C. July 22, 2021). On July 30, 2021, Plaintiff appealed the Court's order denying his motion to stay, and that appeal is currently pending before the Fourth Circuit. See Orr v. EPA, No. 21-1841 (4th Cir.).

Throughout the last four years, Plaintiff has issued various letters and comments styled as "notices of intent to sue." The most recent, and the only purported notice sent after the filing of his 2019 lawsuit, is dated March 12, 2021. See (ECF Nos. 2-3, 2-4, 2-5).

On June 7, 2021, Plaintiff filed the present lawsuit. See (Compl., ECF No. 1). The same day, Plaintiff moved for a TRO. See (ECF No. 3). On June 24, 2021, this Court denied Plaintiff's motion for a TRO, finding that Plaintiff had failed to make the required showing for a TRO that he is likely to succeed on the merits. See (ECF No. 12). On July 29, 2021, FBEMC filed a

9

motion to dismiss Plaintiff's claims, arguing that Plaintiff's action was barred by res judicata and failed to adequately allege standing, and asserting that Plaintiff failed to properly serve Defendants FBEMC and Jeff Loven. See (Doc. Nos. 22, 23). On August 30, 2021, Plaintiff filed a motion for a preliminary injunction. (Doc. No. 35).

## II. STANDARD OF REVIEW

Where a defendant moves to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the Court may consider facts and documents outside of the Complaint without converting a motion to dismiss into one for summary judgment. See In re KBR, Inc., 744 F.3d 326, 333–34 (4th Cir. 2014). However, the burden of establishing jurisdiction falls squarely upon the plaintiff. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); Lovern v. Edwards, 190 F.3d 648, 654 (4th Cir. 1999). Federal courts are courts of limited jurisdiction and may only hear cases or controversies authorized by the Constitution and by statute. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Any waiver of sovereign immunity must be "construed strictly in favor of the sovereign . . . and not enlarge[d] . . . beyond what the language requires." U.S. Dep't of Energy v. Ohio, 503 U.S. 607, 615 (1992) (citations omitted); Middlebrooks v. Leavitt, 525 F.3d 341, 347 (4th Cir. 2008) (stating same).

Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. A complaint fails to state a claim if it either asserts a legal theory that is not cognizable as a matter of law or fails to allege sufficient facts to support a cognizable legal claim. Neitzke v. Williams, 490 U.S. 319, 325, 327–28 (1989). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations

10

omitted). In ruling on a motion to dismiss under Rule 12(b)(6), courts may consider documents incorporated into the complaint by reference and matters of which a court may take judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

### III. DISCUSSION

**A. The action is barred by the doctrine of res judicata.**

The doctrine of res judicata (i.e., claim preclusion) precludes parties from relitigating issues that were or could have been raised in a prior action. Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A., 816 F.3d 273, 276 (4th Cir. 2016). "If a later suit advances the same claim as an earlier suit between the parties, the earlier suit's judgment prevents litigation of all grounds, or defenses to recovery, that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc., 140 S. Ct. 1589, 1594 (2020) (quoting Brown v. Felsen, 442 U.S. 127, 131 (1979) (internal quotes omitted)). A trial court's judgment takes effect despite a pending appeal, as "a judgment's preclusive effect is generally immediate." Coleman v. Tollefson, 575 U.S. 532, 539 (2015). The purpose of the doctrine of res judicata is to enhance judicial efficiency by ensuring the finality of decisions. Brown v. Felsen, 442 U.S. 127 (1979).

The doctrine of res judicata applies to bar actions when three elements are met. Id. First, a final judgment on the merits must have been entered in a prior action. Second, the claim in the second matter is based upon the same cause of action involved in the earlier proceeding. Id. The identities of the claims are evaluated on a transactional approach, meaning that the identities are considered the same if the newly articulated claim "is based on the same underlying transaction [involved in the first lawsuit] and could have been brought in the earlier action." Clodfelter v. Republic of Sudan, 720 F.3d 199, 210 (4th Cir. 2013). Third, the identities of the parties must be

11

identical or in privity in the two actions. Providence Hall Assocs. Ltd. P'ship, 816 F.3d at 276. In addition to these, the court should consider whether the party knew or should have known of its claims at the time of the filing. Id.

Here, the doctrine of res judicata bars Plaintiff's claims. The first and third prongs of the res judicata test are clearly met. This Court's May 15, 2020, Order dismissing the Amended Complaint with prejudice clearly constitutes a final judgment on the merits. (2019 Action, Doc. No. 53). Moreover, Plaintiff and each of the Defendants are identical in both the present action and the 2019 action, such that the identity-of-parties requirement is met as well. (2019 Action, Doc. No. 36).

As to the second element of claim preclusion, the present action is clearly based on the same underlying transaction involved in the first lawsuit, and the claims herein could have unquestionably been brought in the earlier action and were known then to Plaintiff. The 2017, 2019, and 2021 actions were all based on FBEMC using the FDA-approved glyphosate to spray its rights-of-way. In the Complaint filed herein, Plaintiff repeatedly cites to his Notices dated May 26, 2017, April 30, 2018, and July 5, 2019, to establish the requisite elements to demonstrate "harm" to wildlife, and he heavily references those Notices to establish his purported new "Allegations" in this action. (Doc. No. 1, p. 17–18, 54–58, 67–69). However, these exact same Notices were all cited and attached as Exhibits to the Complaint in the prior 2019 action. (2019 Action, Doc. No. 1, Attachments 3, 4, 5, 6).

In both the 2019 action and this action, Plaintiff seeks protection under the ESA for the exact same species: the Bombus affinis (Rusty Patch Bumble Bee), Spruce Fir Moss Spider, Gray Bat, Northern Long-Eared Bat, Virginia Big-Eared Bat. (Doc. No. 1, p. 84; 2019 Action, Doc. No. 36, p. 20).

12

Moreover, Plaintiff's Complaint herein is rife with admissions that he could have brought these claims in the earlier action. Immediately in his Complaint, Plaintiff incorporates the prior 2019 action by reference, and he proceeds to incorporate or reference his prior allegations in the 2019 action repeatedly throughout the Complaint. (Doc. Nos. 1, 9, 15, 17, 18, 53, 54, 55, 56, 57, 58, 66, 67, 68, 69, 89, 90). In his closing remarks, he concludes by stating that the "Plaintiff knew another FBEMC spraying event would occur." (Doc. No. 1, p. 97).

In fact, Plaintiff's Amended Complaint in the 2019 action, which was dismissed by this Court and is pending appeal in the Fourth Circuit, specifically articulated the likelihood of ongoing sprays in future years, which is the sole basis of the present Complaint. As Plaintiff stated in that Amended Complaint, "It is absent question, due to the nature of vegetative growth in a forest, FBEMC must periodically, in perpetuity, re-spray its ROW easements in order to control new vegetative growth under its power lines." (2019 Action, Doc. 36, p. 18). Thus, the preclusive effect of the prior litigation is undeniable.

Although Plaintiff attempts to add some allegations to set the Complaint in this case apart from the prior action, those allegations are clearly artificial attempts to overcome the claim preclusion and standing barriers, which this Court educated Plaintiff about in the 2019 action, and every new fact pled by Plaintiff clearly existed before the 2019 filing and could have been raised therein. For example, Plaintiff now attempts to establish a more substantial injury to himself to overcome the standing issues that resulted in the dismissal of the 2019 action by now claiming that he was "eyeballing" property in the Roan Mountain area for possible acquisition. (Doc. No. 1, p. 95). Yet, he also alleges that his actions in doing so were interrupted by Defendant FBEMC's spraying in 2019. (Id.). Thus, he could have alleged this purported injury in the 2019 action. Furthermore, this "injury" is clearly based upon the same transaction of the

13

FBEMC spraying that underlies the prior Complaint.

Plaintiff also goes into great detail regarding the personal nature of his injury, in an effort to ramp up the prong of the standing requirement that was lacking in the 2019 action, alleging a plethora of emotional injuries and losses and repeatedly claiming that it "made Plaintiff literally cry!" (Doc. No. 1, p. 93–94). However, he also clearly alleges that "[t]his magic Plaintiff enjoyed and his efforts were all suddenly stolen when FBEMC first sprayed in 2017." (Doc. No. 1, p. 93). Moreover, these emotional injuries were also clearly raised in the 2019 action. (2019 Action, Doc. No. 36). Thus, the Complaint on its face acknowledges that Plaintiff's injury occurred back in 2017 and was clearly within Plaintiff's knowledge before the filing of the 2019 action.

Finally, and noteworthy, is the fact that Plaintiff was allowed to file an Amended Complaint in the 2019 action, which he first presented to the Court in his Motion for Leave to Amend filed on December 5, 2019, and which was subsequently filed on January 14, 2020. (2019 Action, Doc. Nos. 29, 36). Thus, Plaintiff had a full and complete opportunity to incorporate all allegations and injuries surrounding FBEMC's spraying, alleged herein to have occurred in June/July 2019, into his Amended Complaint in 2019. (Id.; Doc. No. 1, p. 8).

Similarly, as to the Defendant Loven, for the reasons stated above, Plaintiff could have brought all allegations against him as part of the 2019 action, as they are necessarily derived from the same transactions involving the FBEMC spray activities in 2017 and 2019. Defendant Loven was made a party to the 2019 action, both individually and in his capacity as General Manager for FBEMC, and Plaintiff acknowledges that he had been sending the same Notices to Loven that he had sent to the other Defendants since May 26, 2017. (Doc. No. 1, p. 69). Thus, the alleged conduct by Loven was clearly known to Plaintiff well in advance of the 2019 action,

14

was part of the same transactions at issue in that action, and, thus, Plaintiff's claims against Loven are barred by res judicata.

Given that Plaintiff's claims in the Complaint herein are clearly barred by the doctrine of res judicata, the Court will dismiss the Complaint with prejudice.

**B. This action is barred by the doctrine of collateral estoppel.**

Collateral estoppel (i.e., issue preclusion) precludes a party from relitigating an issue decided in a prior case and necessary to the judgment. Lucky Brand Dungarees, Inc., 140 S. Ct. 1589 at 1594. "When an issue of fact or law is actually litigated and determined by a valid and final judgment, a determination is essential to the judgment, the determination is conclusive in subsequent action between the parties, whether on the same or a different claim." B&B Hardware, Inc. v. Hargis Indus., Inc., 575 U.S. 138, 147 (2015) (quoting The Restatement (Second) of Judgments § 27) (internal quotes omitted). Once a court has decided an issue, it is "forever settled as between the parties." Baldwin v. Iowa State Traveling Men's Ass'n, 283 U.S. 522 (1931). The purpose of collateral estoppel is to protect against the "expense and vexation of attending multiple lawsuits, conserving judicial resources, and fostering reliance on judicial action by minimizing the possibility of inconsistent verdicts." B&B Hardware, Inc. v. Hargis Indus., Inc., 575 U.S. 138, 147 (2015).

The 2019 action filed by Plaintiff against Defendants litigated the same facts and law that are at issue in Plaintiff's 2021 action. The Court clearly determined therein that Plaintiff lacked standing to bring that suit. (2019 Action, Doc. No. 53). The facts and circumstances alleged in the Complaint herein and in the 2019 action are identical in relation to Plaintiff's standing. To allow Plaintiff to proceed with the present action would cause all Defendants to bear the expense of litigating that same issue twice, while draining this Court's valuable judicial resources.

15

Thus, the Court finds that this action is also barred based upon the doctrine of collateral estoppel.

**C. Plaintiff does not have standing to commence this action.**

The United States Constitution limits the jurisdiction of federal courts to "cases and controversies." U.S. Const. Art. III. To meet the "cases and controversies" requirement, a Plaintiff must have standing to bring an action. Pye v. United States, 269 F.3d 459 (4th Cir. 2001). To commence an action, a Plaintiff must prove that (1) he suffered an "injury in fact," (2) that there is a causal connection between the injury and the conduct complained of, fairly traceable to the defendants, and (3) that there is a non-speculative likelihood that the injury will be redressed by a favorable decision by the Court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992); Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016).

A dismissal for lack of standing is effectively the same as a dismissal for failure to state a claim upon which relief can be granted. CGM, LLC v. Bell South Telecommc'ns, Inc., 664 F.3d 46, 52 (4th Cir. 2011). Thus, dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate when plaintiffs lack standing to commence an action. Just as in the 2019 action, Plaintiff's Complaint herein fails to allege sufficient facts that support a finding that he meets any of the three standing requirements.

An injury in fact is defined as something more than an injury to cognizable interest. Lujan, 504 U.S. at 563. An injury in fact is "an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent, not conjectural or hypothetical." Id. For an injury to be "particularized," the injury must affect Plaintiff in a personal and individual way. Id. A Plaintiff must show a direct effect on him aside from his mere "special interest" in the subject, and the injury must affect Plaintiff in a personal and individual way. Id. An injury in fact

must be concrete, real and abstract. Id. It requires that the party seeking review must be among the injured. Id.

The United States Supreme Court has specifically held that the desire to observe an animal species is merely a cognizable interest, as opposed to a legally protected interest. In Lujan v. Defenders of Wildlife, an organization dedicated to wildlife conservation sought an injunction to require the Secretary to reinstate a certain interpretation of the Endangered Species Act. Id. Members of the organization claimed as their "injury" that they had observed endangered species in the past and hoped to do so again. Id. The Court held that "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." Id. at 564. The Lujan Court further reasoned that a plaintiff claiming damage from environmental damage must use the area affected by the challenged activity and not an area roughly "in the vicinity" of it. Id.

Here, Plaintiff has failed to allege any concrete, particularized, actual or imminent injury in fact in his Complaint. His only alleged injuries are that the "rare listed creatures . . . who [he] talks with, dances and sings with, who enjoys their flirting" were harmed by FBEMC's spraying in the past, and that he had to table his "eyeballing" of approximately 200 acres of property on Roan Mountain. Beyond abstract declarations that he can longer study, hike, dance with the "rare listed creatures" of Roan Mountain, or continue to "eyeball" property on Roan Mountain, Plaintiff has failed to allege any specific harm caused to the animals by Defendant's spraying. The harm that Plaintiff has alleged is much more akin to the "special interest" of the Lujan Plaintiffs in hoping to see an endangered species again, than to a personal, individual, concrete injury that the Supreme Court requires for Plaintiffs to have standing. Moreover, Plaintiff herein

17

has not alleged any sort of concrete plan to engage with these animals again. Thus, this Lujan prong is lacking herein, just as it was lacking in the 2019 action.

In addition to requiring a plaintiff to suffer an injury in fact to establish standing, the United States Supreme Court has held that a plaintiff must also establish a causal connection between an injury and the conduct complained of. Lujan, 504 U.S. at 563. In other words, a plaintiff must show that the injury alleged is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. Id. Plaintiff's Complaint fails to establish a causal connection between his alleged injury and Defendants' use of herbicide. Plaintiff presents no facts that support that the alleged harm of the "rare listed creatures" are as a result of FBEMC's spraying, as opposed to death from a natural cause, climate change or third-party intervention. In fact, other than his reference to "listed creatures" and incorporation of his 2019 allegations, Plaintiff fails to even identify the specific endangered species that purportedly suffered harm from Defendants' spraying, and he fails to identify exactly what specific harm has occurred to a listed species.

Moreover, one of the only differences between the Complaint herein and the 2019 action is that, on the face of this Complaint, Plaintiff actually identifies a specific third party that is engaging in the same conduct as FBEMC on Roan Mountain, when he states that Christmas tree farmers on Roan Mountain also spray glyphosate herbicides, as well as other pesticides. (Doc. No. 1, p. 18, n.32). This third party, engaged in the same conduct as alleged against these Defendants, could just as easily have caused the purported harm alleged by Plaintiff. Thus, the Defendants' conduct is not fairly traceable to any injury to Plaintiff.

Even assuming that Plaintiff has suffered an injury that was caused by Defendants, the Court granting Plaintiff's request for a preliminary injunction would not redress his injury, as is

18

required under the third prong of Lujan. As was disclosed at the hearing on Plaintiff's request for a Temporary Restraining Order in this case, the Defendants have finished all scheduled right-of-way maintenance on or around Roan Mountain. Thus, the grant of a preliminary injunction that prevents FBEMC from using its herbicide spray to maintain the right-of-way on Roan Mountain is moot, and Plaintiff has not sought a permanent injunction herein. Therefore, a favorable decision for Plaintiff would not redress Plaintiff's alleged injury. Thus, as the claims and issues raised in Plaintiff's Complaint herein are barred by the doctrines of res judicata and collateral estoppel, and as Plaintiff does not have standing to pursue the claims set forth in his Complaint, Plaintiff's Complaint will be dismissed with prejudice.[4]

### D. Alternative Grounds for Dismissal

The Court finds that, in addition to being barred by res judicata, collateral estoppel, and lack of standing, Plaintiff's claims against the Federal Defendants all suffer from fatal jurisdictional or pleading deficiencies, as argued by the Federal Defendants in their motion to dismiss. That is, as to Plaintiff's ESA Section 7(d) claim—the lone claim he did not plead in his previous lawsuits—Plaintiff did not provide the requisite 60-day notice. Furthermore, Section 7(d) simply does not apply before consultation has been initiated. Plaintiff's claims arising under Section 9 and Section 7(a)(2) of the ESA suffer from essentially the same deficiencies as the nearly identical claims in his past lawsuits. As the Court already held in Orr II, such claims must be dismissed. Plaintiff's section 7(a)(2) claim does not satisfy the jurisdictional requirements of the ESA or FIFRA and is prudentially moot.

---

[4] Furthermore, the Court agrees with Defendants FBEMC and Loven that dismissal is alternatively appropriate under Rule 12(B)(5) because they were not properly served with process.

## IV. CONCLUSION

For the reasons stated herein, Defendants' motions to dismiss will be granted, and this action will be dismissed with prejudice. Moreover, Plaintiff's Verified Urgent Motion for Immediate Temporary Injunction Order will be denied.

**IT IS THEREFORE ORDERED** that:

(1) Defendants' Motions to Dismiss, (Doc. Nos. 22, 37), are **GRANTED**.

(2) Plaintiff's Verified Urgent Motion for Immediate Temporary Injunction Order, (Doc. No. 53), is **DENIED**.

(3) This action is dismissed with prejudice.

Signed: November 18, 2022

Max O. Cogburn Jr
United States District Judge